UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

DELSHAH 60 NINTH, LLC,      :  Civil Action No.:  20-cv-5905 (AJN)

             :

           :

      Plaintiff,   :

           :

           :

  -against-      :

           :

           :

FREE PEOPLE OF PA LLC,     :

           :

           :

      Defendant.  :

           :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

---

## MEMORANDUM OF LAW IN SUPPORT OF FREE PEOPLE OF PA LLC N/K/A URBN US RETAIL LLC'S MOTION FOR SUMMARY JUDGMENT

---

     **FAEGRE DRINKER BIDDLE & REATH LLP**
     1177 Avenue of the Americas**,** 41st Floor
     New York, New York 10036
     Telephone: (212) 248-3140
     Facsimile: (212) 248-3141

     *Attorneys for Free People of PA LLC*
     *n/k/a URBN US Retail LLC*

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................1

FACTUAL AND PROCEDURAL BACKGROUND.......................................................3

RELEVANT LEGAL STANDARDS....................................................................18

ARGUMENT....................................................................................20

    I.    THE COVID-19 PANDEMIC AND THE SHUTDOWN ORDER
        CONSTITUTE A "TAKING" UNDER SECTION 20 OF THE LEASE. ..........20

        A.    A "TAKING" OCCURRED WITHIN THE PLAIN MEANING
            OF SECTION 20......................................................................21

            1.    FREE PEOPLE WAS "DENIED OR DEPRIVED OF
                EITHER THE USE, OCCUPANCY AND/OR
                ENJOYMENT OF THE LEASED SPACE AND/OR THE
                ABILITY TO OPERATE ITS BUSINESS THEREON OR
                THEREFROM." ................................................................21

            2.    THE SHUTDOWN ORDER WAS AN "ACTION OR
                DECREE OF ANY LAWFUL POWER OR
                AUTHORITY." .................................................................23

        B.    AS A RESULT OF THE "TAKING," THE RENT OTHERWISE
            OWED WAS REDUCED BY ONE HUNDRED PERCENT
            (100%). ............................................................................23

    II.    FREE PEOPLE DOES NOT OWE DELSHAH ANY RENT OR OTHER
        DAMAGES. ...........................................................................24

        A.    DELSHAH WAS NOT OWED ANY RENT PRE-
            TERMINATION. ....................................................................25

        B.    DELSHAH IS NOT OWED ANY RENT POST-TERMINATION........25

        C.    DELSHAH IS NOT ENTITLED TO TERMINATION
            DAMAGES.............................................................................26

    III.    DELSHAH BREACHED THE LEASE BY DEMANDING RENT IT
        WAS NOT OWED, FAILING TO REIMBURSE FREE PEOPLE AND
        WRONGFULLY TERMINATING THE LEASE. ............................................30

        A.    DELSHAH BREACHED THE LEASE BY DEMANDING RENT
            THAT WAS NOT DUE. ......................................................30

        B.    DELSHAH BREACHED THE LEASE BY FAILING TO
            REIMBURSE FREE PEOPLE FOR RENT WHICH WAS NOT
            OWED. ............................................................................31

## TABLE OF CONTENTS
(continued)

**Page**

    C.    DELSHAH ALSO BREACHED THE LEASE BY
WRONGFULLY TERMINATING THE LEASE WITHOUT
CAUSE. ...............................................................................................32

    D.    FREE PEOPLE WAS DAMAGED BY DELSHAH'S
BREACHES OF THE LEASE.................................................................33

IV.    DELSHAH WAS UNJUSTLY ENRICHED BY THE ERRONEOUS
PAYMENTS.....................................................................................................33

V.    UPON PREVAILING, FREE PEOPLE IS ENTITLED TO
ATTORNEYS' FEES. ......................................................................................37

CONCLUSION.............................................................................................................37

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*A.I. Trade Finance, Inc. v. Bank*,
   No. 89-7987, 1997 WL 291841 (S.D.N.Y. June 2, 1997) ..................................................... 34

*Akivis v. Drucker*,
   177 A.D.2d 349 (1st Dep't 1991) ........................................................................................ 28

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) .................................................................................................... 18, 19

*Banco Popular North American v. Lieberman*,
   871 N.Y.S.2d 798 (1st Dep't 2008) .................................................................................... 34

*Bank Saderat Iran v. Amin Beydown, Inc.*,
   555 F.Supp. 770 (S.D.N.Y.1983) ........................................................................................ 34

*Banque Worms v. BankAmerica Int'l*,
   77 N.Y.2d 362 (1991) ......................................................................................................... 36

*Blue Cross of Central New York, Inc. v. Wheeler*,
   461 N.Y.S.2d 624 (4th Dep't 1983) .................................................................................... 34

*Boscov's Department Stores, LLC v. AKS Intern. AA Corp.*,
   No. 01 Civ.10580, 2004 WL 205825 (S.D.N.Y. Feb. 4, 2004) ........................................... 31

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ........................................................................................................... 18

*Chesapeake Energy Corp. v. Bank of N.Y. Mellon Tr. Co.*,
   773 F.3d 110 (2d Cir. 2014) ............................................................................................... 20

*Christman v. Maristella Compania Naviera*,
   349 F. Supp. 845 (S.D.N.Y. 1971) ..................................................................................... 31

*City of Almaty v. Sater*,
   503 F. Supp. 3d 51 (S.D.N.Y. 2020) .................................................................................. 33

*Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch,
   Pierce, Fenner & Smith, Inc.*,
   232 F.3d 153 (2d Cir. 2000) ............................................................................................... 20

*Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*,
   411 F.3d 384 (2d Cir. 2005) ............................................................................................... 19

*F.D.I.C. v. Great Am. Ins. Co.*,
    607 F.3d 288 (2d Cir. 2010) ...........................................................................18

*Fed. Ins. Co. v. Am. Home Assur. Co.*,
    639 F.3d 557 (2d Cir. 2011) ...........................................................................20

*Fischer & Mandell, LLP v. Citibank, N.A.*,
    632 F.3d 793 (2d Cir. 2011) ...........................................................................20

*Free People of PA LLC v. Delshah 60 Ninth LLC*,
    Index No. 650654/2017 (Sup. Ct., N.Y. Cnty) ..................................................5

*Matter of Georgetown Unsold Shares, LLC v. Ledet*,
    130 A.D.3d 99, 12 N.Y.S.3d 160 (2d Dep't 2015) ...........................................29

*Gilbert Frank Corp. v Federal Ins. Co.*,
    70 N.Y.2d 966 (1998)....................................................................................29

*Golden Pac. Bancorp. v. F.D.I.C.*,
    375 F.3d 196 (2d Cir. 2004) ...........................................................................18

*Gulf Ins. Co. v. Fidelity & Deposit Co. of Md.*,
    16 Misc.3d 1116[A], 2007 WL 2162885 (Sup. Ct., N.Y. County 2007) ..............32

*Kirby McInerney & Squire, LLP v. Hall Charne Burce & Olson, S.C.*,
    790 N.Y.S.2d 84 (1st Dep't 2005) ...................................................................35

*Mandarin Trading Ltd. v. Wildenstein*,
    16 N.Y.2d 173 (2011).....................................................................................33

*Marte v. Graber*,
    924 N.Y.S.2d 720 (N.Y. App. Term 2d Dep't 2011).........................................31

*Md. Cas. Co. v. Pac. Coal & Oil Co.*,
    312 U.S. 270, 61 S.Ct. 510, 85 L.Ed. 826 (1941) .............................................19

*N.Y. Stock Exch., Inc. v. New York, N.Y. Hotel, LLC*,
    293 F.3d 550 (2d Cir. 2002) ...........................................................................19

*National Bank of Canada v. Artex Industries, Inc.*,
    627 F.Supp. 610 (S.D.N.Y.1986)....................................................................34

*Nelson v. Hatch*,
    70 A.D. 206 (1st Dep't 1902) .........................................................................30

*Opals on Ice Lingerie v. Bodylines Inc.*,
    320 F.3d 362 (2d Cir. 2003) ...........................................................................19

*Scarborough Manor Owners Corp. v. Robson*,
  57 Misc. 3d 24, 59 N.Y.S.3d 877 (N.Y. App. Term. 2d Dep't 2017) ............................. 29, 30

*Simonds v. Simonds*,
  45 N.Y.2d 233 (1978) ................................................................................................... 33

*Spagnola v. Chubb Corp.*,
  574 F.3d 64 (2d Cir. 2009) ........................................................................................... 35

*Spirit Realty, L.P. v. GH & H Mableton, LLC*,
  227 F. Supp. 3d 291 (S.D.N.Y. 2017) .......................................................................... 19

*Stivers v. Brownell*,
  63 A.D.3d 1516 (4th Dep't 2009) ................................................................................. 32

*VW Credit, Inc. v. Big Apple Volkswagen, LLC*,
  No. 11 CIV. 1950 PAE, 2012 WL 919386 (S.D.N.Y. Mar. 15, 2012) ................................. 18

*Winters v. Am. Express Tax & Bus. Servs., Inc.*,
  No. 04-CV-8451(KMK), 2007 WL 632765 (S.D.N.Y. Feb. 27, 2007) ................................. 18

**STATUTES, RULES & REGULATIONS**

Fed. R. Civ. P. 56 ................................................................................................................. 18

N.Y. Real Prop. Law § 232-c .............................................................................................. 28

**OTHER AUTHORITIES**

https://www.merriam-webster.com/dictionary/ancillary ........................................................ 22

Outbreak – New York City, February 29-June 1, 2020, available at
  https://www.cdc.gov/mmwr/volumes/69/wr/mm6946a2.htm ................................................. 6

Restatement (First) of Restitution § 14(a) ........................................................................... 36

Defendant/Counterclaim Plaintiff Free People of PA LLC n/k/a URBN US Retail LLC ("Free People") respectfully submits this memorandum of law in support of its motion for summary judgment pursuant to Fed. R. Civ. P. 56 on Counts I, II, III and IV of Plaintiff/Counterclaim Defendant Delshah 60 Ninth, LLC's ("Delshah") Second Amended Complaint and Counts I, II, V, VII and VIII of Free People's Second Amended Counterclaims.

## PRELIMINARY STATEMENT

Free People's case for summary judgment is straightforward.  In March 2020, Free People was compelled to close its retail store in downtown Manhattan for three months following the outbreak of the COVID-19 pandemic and the issuance of various COVID-19 related executive orders issued by state and local authorities, most notably Executive Order 202.8, known as the "New York State on PAUSE" order.  Pursuant to the express terms of Section 20 of the lease agreement between Free People and Delshah, the pandemic and the governmental shutdown orders constituted a "taking," which explicitly states that no rent is due during the duration of the taking. Notwithstanding, during the darkest days of the pandemic, and despite the unambiguous language of the lease, Delshah issued notices of default to Free People for nonpayment of rent.  When Free People explained to Delshah that rent was not owed while it was unable to operate the retail store -- which Delshah knew or should have known had it only read the lease that it negotiated and agreed to -- Delshah responded by unilaterally issuing a Seven (7) Day Notice of Termination, informing Free People that the lease would terminate on June 10, 2020.  By operation of Delshah's termination notice, the lease terminated on June 10, 2020.

On June 29, 2020, Delshah commenced an action against Free People in the Supreme Court of the State of New York, County of New York by filing a Verified Complaint.  In the Verified Complaint, which was verified by Delshah's principal one day after the termination date of June

10, 2020, Delshah stated that "**Landlord Terminat[ed] the Lease Based upon Tenant's Defaults**."  In the Verified Complaint, Delshah also alleged that, post-termination of the lease, Free People wrongfully remained in possession of the leased space and Delshah sought damages in excess of $10.6 million in termination damages.  On July 31, 2020, within approximately two weeks after the service of the Verified Complaint, Free People mobilized personnel in the midst of an ongoing pandemic and vacated the leased space, in recognition of Delshah's termination of the lease and subsequent lawsuit.

More than 30 days after Free People vacated and surrendered the leased space, Delshah reversed course and unilaterally declared the lease unterminated.  Its purported basis for doing so—Free People's inadvertent and mistaken release of two rent payments following the termination of the lease and its surrender of the leased space—cannot be reconciled with the undisputed facts, which show that the payments were made in error and both Free People and Delshah understood that Free People's tenancy was terminated.  Indeed, Delshah's efforts to find a new tenant, which started shortly after Free People moved out, only increased after the payments were unintentionally made.  Delshah's attempt to undo its termination of the lease, and subsequent re-termination of the lease are pure litigation tactics, undertaken only after Delshah belatedly read the Lease and realized its termination of the lease was without cause, and should be rejected by this Court.

Free People is entitled to summary judgment on Delshah's claims for damages (Count I of Second Amended Counterclaim), declaratory relief (Count II of Second Amended Counterclaim) and money damages based on termination of the lease (Count III of Second Amended Counterclaim), as well as Free People's counterclaims for declaratory relief (Counts I and II of Second Amended Counterclaims).  Free People is entitled to summary judgment because, under

the plain language of Section 20 of the lease, a "taking" occurred, Free People's obligation to pay rent was excused as a result of the taking and, accordingly, Delshah's termination was without cause.

Free People is also entitled to summary judgment on its counterclaim for breach of contract (Count V of Second Amended Counterclaims) because, by demanding rent when none was owed, failing to reimburse Free People for rent attributable to the period during which Free People was deprived of its use of the leased space, and ultimately terminating the lease without cause, Delshah breached the lease.   Delshah should also be compelled to return the payments Free People mistakenly rendered after it vacated the leased space, which have unjustly enriched Delshah (Count VII of Second Amended Counterclaims).[1]   Lastly, Free People should be awarded its attorneys' fees and costs under the applicable lease provision denied (Count VIII of Second Amended Counterclaims), and Delshah's request for attorneys' fees should be denied (Count IV of the Second Amended Complaint).

For these reasons and as set forth more fully below, Free People is entitled to summary judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.    Free People of PA LLC.

Free People is an American apparel and lifestyle retail company that sells women's clothing, accessories, shoes, intimates and swimwear in approximately 136 stores across the

---

[1] Free People is not moving for summary judgment on Counts III (In the Alternative – Rescission/Cancellation of Lease – Based on Frustration of Purpose), IV (In the Alternative – Rescission/Cancellation of Lease – Based on Impossibility of Performance) or VI (Money Had and Received).   To the extent the Court grants Free People summary judgment on the causes of action it is moving on, the Court will not need to reach Counts III, IV or VI.

United States, Europe and Canada.  SMF ¶ 1.[2]   Free People is part of Urban Outfitters, Inc. ("Urban Outfitters"), a portfolio of global consumer brands.  SMF ¶ 2.

**B.    Delshah 60 Ninth, LLC.**

Delshah is the owner of the real property located at 58-60 Ninth Avenue, New York, New York 10114 (the "Building").  SMF ¶ 3. Delshah is one-hundred percent owned by Delshah Capital Limited ("Delshah Capital").  SMF ¶ 4.  Delshah Capital is a sophisticated commercial entity, managing a portfolio of real estate assets valued at more than $800 million.  Michael K. Shah is the founder and managing partner of Delshah Capital, and is the quintessential "sophisticated counterparty."[3]

**C.    The Lease.**

The parties negotiated the terms of the Lease prior to its execution.  SMF ¶ 17.  Delshah was represented by counsel during the negotiation process—Ian Lester, Esq. of Bleckner, P.C.—and Mr. Shah participated in the negotiation of the Lease.  SMF ¶ 18.  Multiple drafts were exchanged over a period of several months.  Delshah's counsel and Mr. Shah revised Section 20 in several ways to make it more favorable to Delshah.  Most notably, Delshah more than tripled the period of time (from 150 days to 365 days) for which Free People's possession, use, occupancy, enjoyment and operation of the Leased Space would need to be impacted before a taking, as opposed to a "temporary taking," could be deemed to have occurred.  SMF ¶ 19.[4]

---

[2] Free People's Local Rule 56.1 Statement of Material Facts (the "SMF") is submitted herewith.
[3] Prior to establishing Delshah, Mr. Shah attended college at Harvard University, from which he graduated *magna cum laude*, graduate school at the London School of Economics, and law school at Harvard Law School, from which he graduated first in his class.  After graduating from law school, Mr. Shah worked as an attorney at Wachtell Lipton Rosen & Katz in New York City, where he specialized in mergers and acquisitions, negotiations and bankruptcies.  SMF ¶¶ 5-7.
[4] If a non-temporary taking occurs, the Lease terminates as to the part of the Leased Space subject to taking.  Morgan Cert., Ex. 1 (Lease) § 20(a).  A temporary taking, on the other hand, results in a reduction of rent and the suspension of other Lease obligations.  Morgan Cert., Ex. 1 (Lease) §

On or about March 13, 2015, Free People, as tenant, entered into a lease with Delshah, as landlord (the "Lease"), for commercial retail space in the Building (the "Leased Space") for an initial lease term of ten years.  SMF ¶ 8.  The purpose of the Lease was to provide Free People with commercial retail space suitable for the operation of a brick-and-mortar retail store.  SMF ¶ 9.  Section 4 of the Lease states that the Leased Space "may be used and occupied for the Permitted Uses."  *See* Certification of Brian P. Morgan pursuant to 28 U.S.C. § 1746 ("Morgan Cert."), Ex. 1 (Lease) § 4.  The Lease's Schedule of Terms defines "Permitted Uses," in turn, as "[a]ny general retail use, including the display and sale of apparel, shoes and accessories, gifts, cards, furniture, home furnishings, housewares, packaged foods prepared for off-site consumption, plants, fresh and dried flowers, pots, containers and stands for plants or flowers, and/or items related to the foregoing, together with ancillary office and storage use."  Morgan Cert., Ex. 1 (Lease) at III.  But for the ability to operate a retail store at the Leased Space, Free People would not have entered into the Lease.  SMF ¶ 12.

In exchange for the ability to operate a retail store at the Leased Space, Free People agreed to pay Delshah Minimum Rent (beginning at $1,325,000 *per annum*) and Additional Rent, the latter of which includes all costs and charges other than Minimum Rent payable by Free People to Delshah pursuant to the provisions of the Lease.  Morgan Cert., Ex. 1 (Lease) at II, §§ (3)(e), 5, 7.

**D.      The COVID-19 Pandemic and Governmental Shutdown Orders.**

On or about December 5, 2016,[5] Free People opened a retail apparel store at the Leased

---

20(d).  Accordingly, Delshah's principal was directly involved with the negotiation of the Lease provision providing for a potential cessation of all rent during a temporary taking.

[5] Delshah's failure to deliver the Leased Space in a timely manner (the Lease called for a delivery date of August 1, 2015), was the subject of prior litigation between the parties.  In *Free People of PA LLC v. Delshah 60 Ninth LLC*, Index No. 650654/2017 (Sup. Ct., N.Y. Cnty 2017), the Honorable Barry Ostrager held that "the undisputed evidence established that [Delshah] failed to deliver [the Leased Space] until nearly a year after the date contemplated in the Lease" and that

Space (the "9th Ave. Store").  SMF ¶ 20.  Free People maintained and operated the 9th Ave. Store

until March 2020.  Free People paid rent for March 2020 in full on or about February 26, 2020.

SMF ¶ 61.

In March 2020, the COVID-19 pandemic, an ongoing global pandemic of coronavirus

disease 2019 (COVID-19) caused by severe acute respiratory syndrome coronavirus 2

(SARS-CoV-2) (the "COVID-19 Pandemic"), was rapidly spreading throughout New York City

and the State of New York, with thousands of people becoming infected with COVID-19 on a

daily basis.  Confirmed cases of COVID-19 among residents of New York City increased from

274 cases per day during the week of March 8, 2020 to 5,132 cases per day by the week of March

29, 2020.[6]  In New York City during the first week of April 2020, more than 560 people a day

were dying from COVID-19.[7]

In response to the rapidly escalating public health emergency, the Governor of the State of

New York, Andrew M. Cuomo, and the Mayor of New York City, Bill de Blasio, issued a series

of executive orders aimed to "flatten the curve" and slow the spread of COVID-19.  SMF ¶ 34.

On March 7, 2020, Governor Cuomo issued Executive Order No. 202.  Morgan Cert., Ex.

11 (Executive Order No. 202).  That order, issued in response to the rapidly escalating public

health emergency, stated that "a disaster [was] impending in New York State, for which the

affected local governments [would be] unable to respond adequately" and therefore the declaration

---

Delshah "was responsible for slightly less than nine months of the delay."  Morgan Cert., Ex. 62
(Decision) at 1, 5.  Notwithstanding, the court declined to enforce the rent credits provision in the
Lease, instead awarding Free People what it found to be Free People's actual damages for the
delay.  *See id.*  The trial court's decision was affirmed by the Appellate Division of the Supreme
Court, First Judicial Department.
[6]  Morgan Cert., Ex. 10 (CDC Weekly Report, Covid-19 Outbreak – New York City, February
29-June 1, 2020, available at https://www.cdc.gov/mmwr/volumes/69/wr/mm6946a2.htm).
[7]  *See id.*

of "a State disaster emergency for the entire State of New York" was necessary.  *See id.*  On March 12, 2020, Governor Cuomo issued Executive Order 202.1, requiring any place of business to operate at no greater than fifty percent (50%) occupancy.  Morgan Cert., Ex. 12 (Executive Order No. 202.1).

On March 12, 2020, Mayor de Blasio issued Emergency Executive Order No. 98, declaring a disaster in the City of New York.  Morgan Cert., Ex. 13 (Emergency Executive Order No. 98). On March 16, 2020, Mayor de Blasio issued Emergency Executive Order No. 100, pursuant to which certain businesses including all restaurants, bars, cafes, entertainment venues and commercial gyms were closed (subject to certain exceptions for take-out or delivery service). Morgan Cert., Ex. 14 (Emergency Executive Order No. 100).

On March 18, 2020, Governor Cuomo issued Executive Order 202.6, requiring nonessential businesses to reduce their in-person work force by fifty percent (50%).  Morgan Cert., Ex. 15 (Executive Order No. 202.6).  The 9th Ave. Store was non-essential under this order.  *See id.*

On March 20, 2020, Governor Cuomo issued Executive Order 202.8 (the "Shutdown Order"), requiring non-essential businesses to "***reduce [their] in-person workforce at any work locations by 100% no later than March 22[, 2020] at 8 p.m.***"  Morgan Cert., Ex. 16 (Executive Order No. 202.8) (emphasis added) SMF ¶ 40.  The 9th Ave. Store was non-essential under this order.  *See id.*

That same day, March 20, 2020, Mayor de Blasio issued Emergency Executive Order No. 102, further restricting various commercial operations in New York City.  Morgan Cert., Ex. 17 (Emergency Executive Order No. 102).

On March 14, 2020, less than a week prior to the issuance of the Shutdown Order, Urban

Outfitters had made the difficult decision to temporarily close all of its stores around the globe for a two-week period, or at least until March 28, 2020.  SMF ¶ 42.  In a news release announcing the decision, Urban Outfitters stated that the stores were being closed "in an effort to protect our communities," "including our loyal customers and dedicated associates."  Morgan Cert., Ex. 18 (March 14, 2020 Press Release).  Because of the Shutdown Order, the 9th Ave. Store did not reopen at the end of the two-week period, but rather remain closed to retail customers while the Shutdown Order and other executive orders remained in effect.

On June 22, 2020, as part of the second phase of New York's multiphase reopening, retail stores in New York were permitted to reopen under stringent new requirements, including limiting capacity to fifty percent (50%), mandating face masks in-store, ensuring social distancing of six feet when possible and adhering to disinfecting guidelines.  SMF ¶ 45.

### E.    Relevant Lease Provisions.

In the Lease, the parties expressly agreed that governmental actions or decrees which deprived Free People of the right to use the Leased Space for retail operations would relieve Free People of its obligations under the Lease, including the payment of rent.

Specifically, Section 20(a) of the Lease states, in relevant part:

> If any portion(s) of the Leased Space is taken or condemned for a public or quasi-public use by any lawful power or authority, or if Tenant is denied access to or egress from the Leased Space by any action or decree of any lawful power or authority or as a result of natural or other disaster, or *if Tenant is denied or deprived of either the use, occupancy and/or enjoyment of the Leased Space and/or the ability to operate its business thereon or therefrom by action or decree of any lawful power or authority* or as a result of natural or other disaster, or by any oral or written agreement between Landlord or any such power or authority or by the acquiescence of Landlord (individually, and collectively, a "taking"), and the taking is not deemed "temporary" (as that term is hereinafter defined), this Lease shall, as to the part that is subject to the taking, terminate as of the date Tenant is denied or deprived of such possession, use, occupancy, enjoyment and/or operation of or on the Leased Space, and *the Rent due hereunder shall be reduced proportionately by the square footage of the Leased Space that is so affected*.

-8-

Morgan Cert., Ex. 1 (Lease) § 20(a) (emphasis added).  "Rent" is defined in Section 3(e) of the Lease as "Minimum Rent and all sums payable and collectible as Additional Rent."  Morgan Cert., Ex. 1 (Lease) § 3(e).

Section 20(d) of the Lease states, in relevant part:

> A taking, whether partial or total, shall be deemed "temporary" hereunder if, as of the date on which such taking commenced, Tenant has the expectation that, within three hundred sixty-five (365) days after the taking, Tenant's access and egress to and from the Leased Space, and/or Tenant's possession, use, occupancy, enjoyment and operation of or on the Leased Space, as the case may be, shall be restored to the satisfaction of Tenant.  ***In the event of a temporary taking, Rent shall be reduced as aforesaid, and Tenant's other obligations under this Lease shall be suspended, for the duration thereof.***

Morgan Cert., Ex. 1 (Lease) § 20(d) (emphasis added).

### F.       Free People Is Unable to Operate its Business from the Leased Space For Three Months.

Because of the COVID-19 pandemic and the related government-mandated shutdowns, Free People was unquestionably "denied or deprived of either the use, occupancy and/or enjoyment of the Leased Space and/or the ability to operate its business thereon or therefrom by action or decree of any lawful power or authority or as a result of natural or other disaster."  Morgan Cert., Ex. 1 (Lease) § 20(a).

From 8 p.m. on March 22, 2020 until June 22, 2020, a period of approximately three months, the 9th Ave. Store was closed to retail customers pursuant to the Shutdown Order and other governmental orders.  SMF ¶¶ 40-46.

No Free People employees were even allowed to set foot inside the store between the evening of March 22 and the morning of April 9, 2020, a period of nearly three weeks.  SMF ¶ 47. On April 9, 2020, the New York Empire State Development Corporation issued guidance on Executive Order 202.6 establishing the categories of businesses and industries that are considered

"essential" (the "April 9 Guidance").   Morgan Cert., Ex. 22 (Guidance for Determining Whether a Business Enterprise Is Subject to a Workforce Reduction Under Recent Executive Orders). Regarding retail, the April 9 Guidance states that "essential businesses" shall include "delivery for orders placed remotely via phone or online at non-essential retail establishments; provided, however, that only one employee is physically present at the business location to fulfill orders." *Id.*

In addition to its retail stores, Free People sells merchandise through its website, https://www.freepeople.com/.   SMF ¶ 50.   When a customer places an order online, Free People's inventory monitoring system determines whether the order should be fulfilled from one of Free People's fulfillment centers or a retail store.   SMF ¶ 51.   Among the factors considered by the inventory monitoring system are inventory levels (i.e., whether the item is in stock and, if so, where) and estimated delivery time.   SMF ¶ 52.   When the inventory monitoring system determines that an online order should be fulfilled by a particular retail store, the fulfillment process is referred to as "pick, pack and ship," or "PPS."   SMF ¶ 53.   For PPS, a retail store employee will pack the merchandise and arrange for it be picked up by a shipping service such as FedEx.   SMF ¶ 54. Revenues from online sales fulfilled via PPS are not included within the sales numbers for the retail store which packed the merchandise, unless a store employee assisted the customer in placing the order.   SMF ¶ 55.

Historically, the 9th Ave. Store participated in PPS.   Following the issuance of the April 9 Guidance, Free People analyzed whether its New York retail stores could resume PPS, taking into account whether any employees could safely travel to the stores, whether the volume of orders justified the expense, whether a shipping service was available to pick up orders, etc.   SMF ¶ 56. In an effort to mitigate the ongoing damages caused by the COVID-19 Pandemic and the Shutdown

Order, the 9th Ave. Store resumed PPS on April 20, 2020.  SMF ¶ 57.  Pursuant to the April 9

Guidance, only one employee at a time was physically present at the 9th Ave. Store.  *See id.*

On June 8, 2020, New York allowed nonessential retail locations like the 9th Ave. Store to

offer curbside pickup, i.e., customers who placed an order online or over the phone could pick up

the item outside of the retail establishment.  SMF ¶ 26.  The 9th Ave. Store did not previously

offer curbside pickup but introduced the option in June 2020, in another attempt to soften the

economic blow of the COVID-19 Pandemic and the Shutdown Order.  SMF ¶ 59.  In June 2020,

just six orders were placed for curbside pickup, totaling $246.00.  SMF ¶ 60.

### G.      Delshah's Wrongful Termination of the Lease.

As of March 23, 2020, under Section 20 of the Lease, the rent otherwise owed by Free

People to Delshah was reduced proportionately by the square footage of the Leased Space affected

by Shutdown Order, i.e. one-hundred percent (100%), and Free People's other obligations under

the Lease were suspended.  Morgan Cert., Ex. 1 (Lease) § 20.  Accordingly, Free People did not

pay rent to Delshah for April 2020.  SMF ¶ 62.

Delshah was aware of the COVID-19 Pandemic and relevant Executive Orders.  SMF ¶

63.  And Delshah was also aware that Free People was unable to operate its business from the

Leased Space, specifically noting that it was cognizant of the "impact that Covid 19 and the

national state of emergency" had on Free People's business.  SMF ¶ 64.  When Mr. Shah,

Delshah's principal, asked Tom Yaegel, Director of Finance for Urban Outfitters, what were Free

People's "plans for rent and tax payments during this state of emergency," Mr. Yaegel explained

that:

> As you know, we have not been able to operate our business from the premises for
> several weeks.  Until we have more clarity on if/when we can continue operating
> our business as before the pandemic, we cannot finalize any plans moving forward.

Morgan Cert., Ex. 33 (Email Correspondence between 4/7/20 and 4/15/20).

Despite Free People's explanation that it could not operate its business from the Leased Space, as Section 20 contemplates, Delshah asserted, by Notice to Tenant of Landlord's Failure to Receive Rent dated April 30, 2020 (the "April 30 Nonpayment Notice"), that Free People was in arrears to Delshah in the amount of $134,978.36.[8]  SMF ¶ 66.

In May 2020, the Chairman and Chief Executive Officer of Urban Outfitters, Richard A. Hayne, sent a letter to all landlords of stores within Urban Outfitters' portfolio.  SMF ¶ 68.  In the letter, Mr. Hayne stated that "[a]s you know, our stores have been closed to the public since March, as the nation endured an extended government mandated shutdown," and that Urban Outfitters has been "withholding rent during the period when our stores were forced to close."  Morgan Cert., Ex. 36 (May 7 Correspondence).  Notwithstanding, Mr. Hayne informed the landlords that "[a]s a showing of our good faith, within the next few days, we will be sending you payment representing half of the rent for the first month is able to open to the public."  *Id.*

On May 9, 2020, Mr. Shah acknowledged receipt of the correspondence from Mr. Hayne and sent Free People a "Lease Pre-Negotiation Agreement," which Mr. Shah asked Free People to execute so that the parties could discuss a potential resolution.  SMF ¶ 71.  Mr. Yaegel, on behalf of Free People, returned the signed pre-negotiation agreement, while reiterating that "[w]e believe the rent does not apply during the government mandated closure period."  SMF ¶ 72.  Consistent with the Mr. Hayne's letter, Mr. Yaegel also stated that "[w]e are working to process 50% of the

---

[8] The $134,973.86 consisted of the monthly Minimum Rent that would otherwise be owed for April 2020 ($120,655.27) plus Additional Rent for real estate taxes and elevator maintenance. Morgan Cert., Ex. 35 (April 30 Nonpayment Notice).  The amount asserted also includes a balance of $6,142.83, which Free People did not owe.  Since at least July 2019, Delshah had been overcharging Free People for its share of real estate taxes by $1,347.59 per month.  SMF ¶¶ 21-32.  As of March 1, 2020, Free People had been overcharged by $12,128.31, nearly $6,000 more than the amount Delshah contends was owed.  SMF ¶¶ 31-32.

current rent as a good faith payment towards a solution.  This payment is for the month we are able to reopen." SMF ¶ 73.

As promised, on or about May 15, 2020, Delshah received a payment from Free People in the amount of $63,536.73, representing approximately half of the current monthly Minimum Rent and Additional Rent.  SMF ¶ 74.  However, Delshah did not treat the payment as a credit for "half of the rent for the first month is able to open to the public," but rather applied it to the balance it erroneously contended that Free People owed.  SMF ¶ 75.

Delshah issued a second Notice to Tenant of Landlord's Failure to Receive Rent dated May 28, 2020, in which it asserted that Free People was in arrears to Landlord for the period from April 1, 2020 through and including May 20, 2020, in the amount of $197,971.58 (the "May 28 Nonpayment Notice" and, together with the April 30 Nonpayment Notice, the "Nonpayment Notices").  SMF ¶ 76.

That same day, Delshah issued a Seven (7) Day Notice of Termination dated May 28, 2020 (the "Termination Notice").  SMF ¶ 77.  In the Termination Notice, Delshah asserted that Free People had failed to pay Minimum Rent and Additional Rent due under the Lease between April 1, 2020 and May 1, 2020, and was in arrears in the amount of $197,681.62.  Morgan Cert. Ex. 41 (Termination Notice).  The Termination Notice stated that "Tenant's tenancy is hereby terminated effective June 10, 2020" (the "Termination Date"), and that if Free People did not "quit, vacate and surrender possession" of the Leased Space, Delshah would sue for possession.  *Id.*

## H.  Delshah Sues Free People for More than $10.6 Million.

Despite having sent the Termination Notice, Delshah continued to engage with Free People in June 2020 regarding a potential resolution.  On June 22, 2020, in-person retail stores in New York City were allowed to reopen to retail customers, albeit with marginal capacity only.  SMF ¶

81.  In light of the ongoing discussions with Delshah, Free People reopened the 9th Ave. Store to retail customers and, on June 29, 2020, released a rent payment for July 2020 in the amount of $123,864.37.  SMF ¶¶ 80-82.

Unbeknownst to Free People, however, that same day Delshah commenced an action against Free People in the Supreme Court of the State of New York, County of New York entitled *Delshah 60 Ninth, LLC., v. Free People of PA LLC* by filing a Summons and Verified Complaint, which was assigned Index No. 652791/2020 (the "State Court Action").  SMF ¶ 83.  In the Verified Complaint filed in the State Court Action (the "Verified Complaint"), Delshah stated that "**Landlord Terminat[ed] the Lease Based upon Tenant's Defaults**."  Morgan Cert., Ex. 42 (Verified Complaint) at 5.  In the Verified Complaint, Delshah also alleged that, post-termination of the Lease, Defendant wrongfully remained in possession of the Leased Space and sought damages in excess of $10.6 million, representing the rent Delshah asserted was due for the balance of the term.  Morgan Cert., Ex. 42 (Verified Complaint) at 6-8.

On July 2, 2020, Mr. Shah sent a copy of the Verified Complaint to Mr. Yaegel and Michael Silbert, Deputy General Counsel for Urban Outfitters, who had not previously seen it.  SMF ¶ 86. Based upon the Termination Notice and the Verified Complaint filed in the pending State Court Action, Urban Outfitters' executive leadership team reached the conclusion that Free People was no longer in a position to operate the 9th Ave. Store and made the decision to vacate the Leased Space by the end of the month.  SMF ¶ 87.

As demanded by Delshah in the Termination Notice, Free People quit, vacated and surrendered possession of the Leased Space.  Free People moved out of the Leased Space on July 31, 2020.  SMF ¶ 88.  That same day, counsel for Free People sent a letter to Bradley S. Silverbush, Esq., counsel for Delshah, advising him that, following the termination of the Lease, Free People

vacated the Leased Space and requesting direction on how to return the keys to the Leased Space. SMF ¶ 89.  On August 4, 2020, Mr. Silverbush responded "[r]egarding your client's vacatur and surrender of possession, the keys may be delivered to Delshah's offices."  SMF ¶ 90.  Delshah received the keys on or about August 17, 2020.  SMF ¶ 91.

On August 11, 2020, Delshah requested that Free People provide as-built plans for the Leased Space and any professional marketing photographs Free People may have to assist in the re-leasing of the Leased Space.  SMF ¶ 92.  Free People provided Delshah with the final plans for the Leased Space and photographs of the vacant space.  SMF ¶ 93.  By early August 2020, Lantern, a real estate advisor who was working with Delshah on its portfolio, was preparing marketing materials and discretely marketing the Leased Space, with the aim of publicly marketing the Leased Space by early September 2020.  SMF ¶ 94.

## I.      Delshah's Ineffective Attempt to Undo its Termination of the Lease.

On August 14, 2020, Defendant filed its Answer and Counterclaims to the Verified Complaint.  [Docket No. 4].[9]  In its Answer and Counterclaims, Defendant acknowledged Delshah's wrongful termination of the Lease and stated that it had vacated the Leased Space on July 31, 2020.  [Docket No. 4 at 19-20].

On August 27, 2020, Free People inadvertently and unintentionally released a payment to Delshah in the amount of $123,864,37.  SMF ¶ 98.  When Free People made the decision in July to vacate the Leased Space by July 31, 2020, Alyssa Zoller, Urban Outfitters' Lease Administration Manager, who is responsible for processing monthly payments to all of the stores in Urban Outfitters' portfolio, including Free People, stopped the rent payment for August by directing Free People's accounts payable department to put a hold on the payment.  SMF ¶ 99.  At

---

[9] Free People removed the State Court Action to this Court on July 29, 2020.  [Docket No. 1].

that time, however, Ms. Zoller did not access Property Manager, Free People's leasing software system, to cancel all future payments to Delshah.   When she was asked to do so in mid-August 2020, Ms. Zoller failed to do so.  SMF ¶ 100.   As she testified, with stores closing and reopening across the country, "the pandemic was a little bit crazy" and she simply made a mistake.  SMF ¶ 101.   No one at Free People instructed Ms. Zoller to release the payment on August 27, 2020; it occurred because the payment had been previously scheduled when the Lease was entered into in 2015 and Ms. Zoller mistakenly failed to cancel it.  SMF ¶ 102.

On September 22, 2020, Ms. Zoller updated Property Manager to reflect that the Lease had been terminated.  SMF ¶ 103.  At that time, Ms. Zoller also created a "credit memo" in the system, the effect of which should have been to cancel the rent payment for August 2020 that was put on hold on July 27, 2020.  SMF ¶ 104.  Ms. Zoller instructed Free People's accounts payable department to apply the credit memo to the payment, however accounts payable inadvertently released the payment instead, resulting in a second erroneous payment being sent to Delshah on September 22, 2020 (together with the August 27, 2020 payment, the "Erroneous Payments"). SMF ¶ 105.

Delshah was confused by the Erroneous Payments given Free People's very clear acknowledgement that the Lease had been terminated and its surrender of the Leased Space, but it did not make any inquiries of Free People or offer to return the funds.  SMF ¶ 106.  Rather, Delshah seized on the Erroneous Payments as basis to launch a litigation-driven strategy to try to undo its termination of the Lease.  By way of letter dated August 31, 2020, Delshah's counsel purported to withdraw the Termination Notice in light of Defendant's "continued possession and payment of rent after [the Termination Date]."  SMF ¶ 107.  On September 10, 2020, Free People responded, through counsel, that Delshah's purported "withdrawal" of the Termination Notice was "of no

effect, other than to serve as implicit acknowledgement by [Delshah] that its termination of the lease was without basis and wrongful." SMF ¶ 108.

After Free People learned of the Erroneous Payments, counsel for Free People advised Delshah that the Erroneous Payments were sent inadvertently and unintentionally, as Delshah knew given Delshah's prior termination of the Lease and Free People's surrender of the Leased Space. SMF ¶ 109. Free People again repudiated Delshah's attempts to unwind its termination of the Lease. Morgan Cert., Ex. 57 (10/9/20 W. Connolly Letter). Free People also demanded that Delshah return the Erroneous Payments, which, to date, it has failed to do. *See id.*

In a further attempt to bolster its purported withdrawal of the Termination Notice, on December 9, 2020, Delshah served Free People with a second Seven (7) Day Notice of Termination (the "Second Termination Notice") and a Notice to Tenant of Landlord's Failure to Receive Rent. SMF ¶ 110. In response to this obvious litigation tactic, Free People, through counsel, informed Delshah that the Second Termination Notice, having been issued more than four months after the Lease was terminated and Free People ceased to be a tenant, was redundant and of no legal effect. SMF ¶ 111.

### J.   Operative Pleadings and Procedural Posture.

On January 28, 2021, Delshah filed the Second Amended Complaint [Docket No. 24].

On February 11, 2021, Free People filed the Second Amended Answer and Second Amended Counterclaims [Docket No. 25].

On February 24, 2021, Delshah filed the Answer to Second Amended Counterclaims [Docket No. 28].

All discovery is complete as of September 16, 2021. [Docket No. 61]. Free People is filing this Motion for Summary Judgment pursuant to the Court's endorsement of the joint letter from

the parties dated September 17, 2021.  [Docket No. 60].

## **RELEVANT LEGAL STANDARDS**

### A.      **Summary Judgment.**

To prevail on a motion for summary judgment, the moving party must show that there is no genuine, triable issue of material fact, and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *VW Credit, Inc. v. Big Apple Volkswagen, LLC*, No. 11 CIV. 1950 PAE, 2012 WL 919386, at *2 (S.D.N.Y. Mar. 15, 2012); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  If a moving party seeks dismissal of the non-moving parties' claims, it can discharge its initial burden by demonstrating that there is an absence of evidence to support the non-moving party's case on an issue for which the non-moving party bears the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).  The burden then shifts to the non-moving party, which must raise a genuine issue of material fact.  *Anderson*, 477 U.S. at 250.

To carry its burden, the non-moving party must present evidence sufficient to support a jury verdict in its favor, and "may not rely on mere conclusory allegations [or] speculation." *Golden Pac. Bancorp. v. F.D.I.C.*, 375 F.3d 196, 200 (2d Cir. 2004) (citation omitted); *see also F.D.I.C. v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (citations and internal quotation marks omitted) ("[T]he non-moving party must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation").  The adverse party "may not rest upon the mere allegations or denials of [its] pleading, but the adverse party [ ] must set forth specific facts showing that there is a genuine issue for trial."  *Winters v. Am. Express Tax & Bus. Servs., Inc.*, No. 04-CV-8451(KMK), 2007 WL 632765, at *4 (S.D.N.Y. Feb. 27, 2007) (citing Fed. R. Civ. P. 56(e)).

Additionally, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of material fact." *Opals on Ice Lingerie v. Bodylines Inc.*, 320 F.3d 362, 368 (2d Cir. 2003) (quoting *Anderson*, 477 U.S. at 247-48). "A dispute is not 'genuine' unless the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *N.Y. Stock Exch., Inc. v. New York, N.Y. Hotel, LLC*, 293 F.3d 550, 554 (2d Cir. 2002) (*quoting Anderson*, 477 U.S. at 248).

## B.    Declaratory Relief.

Declaratory relief is available as a remedy where an "actual controversy" exists between the parties and "[t]he determinative issue is 'whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *Spirit Realty, L.P. v. GH & H Mableton, LLC*, 227 F. Supp. 3d 291, 296-97 (S.D.N.Y. 2017) (quoting *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826 (1941)).  Whether to grant declaratory relief is subject to the court's discretion, which turns on the following considerations:  "(1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and (2) whether a judgment would finalize the controversy and offer relief from uncertainty." *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 411 F.3d 384, 389 (2d Cir. 2005) (citation omitted).  Here, the parties agree that an actual controversy exists between Free People and Delshah regarding the applicability of Section 20 of the Lease. Declaratory relief from the Court will clarify and settle the controversy and offer relief from any future uncertainty.

C.    **Contract Interpretation.**

Under New York law, the Court must look to the unambiguous terms of the Lease to interpret its meaning. "Summary judgment is appropriate where contractual terms are unambiguous." *Fischer & Mandell, LLP v. Citibank, N.A.*, 632 F.3d 793, 799 (2d Cir. 2011) (citation omitted). Conversely, "contract claims are generally not subject to summary judgment if the resolution of a dispute turns on the meaning of an ambiguous term or phrase." *Fed. Ins. Co. v. Am. Home Assur. Co.*, 639 F.3d 557, 567 (2d Cir. 2011) (citations omitted). In deciding whether contract language is ambiguous, "the court should not find the language ambiguous on the basis of the interpretation urged by one party, where that interpretation would strain the contract language beyond its reasonable and ordinary meaning." *Id.* at 568 (internal quotation marks and citations omitted). Even if the contractual language is ambiguous, "summary judgment can be granted if the non-moving party fails to point to any relevant extrinsic evidence supporting that party's interpretation of the language." *Id.* at 567 (citation omitted). In the end, the court's "primary objective" is "to give effect to the intent of the parties as revealed by the language of their agreement." *Chesapeake Energy Corp. v. Bank of N.Y. Mellon Tr. Co.*, 773 F.3d 110, 113-14 (2d Cir. 2014) (quoting *Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 232 F.3d 153, 157 (2d Cir. 2000)).

## **ARGUMENT**

I.    **THE COVID-19 PANDEMIC AND THE SHUTDOWN ORDER CONSTITUTE A "TAKING" UNDER SECTION 20 OF THE LEASE.**

Count I of Free People's Second Amended Counterclaim and Count II of Delshah's Second Amended Complaint both seek declaratory relief adjudicating the rights and obligations of the parties under the Lease. Dkt. No. 25 ¶¶ 63-70; Dkt. No. 24 ¶¶ 64-65. On each of these Counts, the Court should find that, as a matter of law, the COVID-19 Pandemic and related government-

mandated shutdowns, commencing in March 2020 and culminating with the Shutdown Order, operated as a "taking" within the meaning of Section 20 of the Lease that excused Free People's obligation to pay rent.

**A.    A "Taking" Occurred Within the Plain Meaning of Section 20.**

The language of the Lease is clear:  a "taking" occurs "if Tenant is ***denied or deprived of either the use, occupancy and/or enjoyment of the Leased Space and/or the ability to operate its business thereon or therefrom*** by ***action or decree of any lawful power or authority*** or ***as a result of natural or other disaster***."    Morgan Cert., Ex. 1 (Lease) § 20 (emphasis added).    Each component of this clause is satisfied here.

1.    Free People was "denied or deprived of either the use, occupancy and/or enjoyment of the Leased Space and/or the ability to operate its business thereon or therefrom."

It is beyond dispute that Free People was denied its "use, occupancy and/or enjoyment" of the Leased Space as well as its "ability to operate its business thereon or therefrom" due to the COVID-19 Pandemic and the ensuing Shutdown Order.  Prior to the COVID-19 Pandemic, Free People operated a brick-and-mortar retail store from the Leased Space, at which customers would walk in from the streets of the Meatpacking District – one of the most popular shopping areas in New York City – and browse or purchase Free People's wares.  SMF ¶¶ 9, 12, 20.  But for the ability to operate a retail store at the Leased Space, Free People would not have entered into the Lease.  SMF ¶ 12.  Indeed, Free People's ability to use the Leased Space as a retail store was the sole consideration it received under the Lease and the basis for its agreement to pay Minimum Rent starting at $1,325,000 *per annum* and increasing to $1,728,824.47 over the life of the Lease. Morgan Cert., Ex. 1 (Lease) § 4, II-III.  When the COVID-19 Pandemic and the Shutdown Order forced Free People to close the doors of the 9th Ave. Store to retail customers, Free People was

denied or deprived the ability to use the Leased Space as a retail store and operate its retail business therefrom.

Free People anticipates that Delshah will argue that, notwithstanding Free People's inability to use the Leased Space as a retail store as contemplated by the Lease, Free People still derived from some benefit from the Leased Space from the storage of inventory and fulfilling a limited number of online orders.  However, neither storage nor shipping merchandise purchased online constitutes using the Leased Space for their intended purpose or operating Free People's business therefrom.  The Lease states that the "PURPOSE" of the Lease is to use and occupy the Leased Space for the "Permitted Uses," which are defined as "Any general *retail* use, including *the display and sale of apparel*, shoes and accessories, gifts, cards, furniture, home furnishings, housewares, packaged foods prepared for off-site consumption, plants, fresh and dried flowers, pots, containers and stands for plants or flowers, and/or items related to the foregoing, together with ancillary office and storage use."  Morgan Cert., Ex. 1 (Lease) at III (emphasis added).  The Lease foregrounds "general retail use, including the display and sale of apparel" as the purpose of the Lease while noting that "general retail use" is permitted "together with ancillary office and storage use."  Merriam-Webster defines "ancillary" as "subordinate, subsidiary" and "auxiliary or supplementary."[10]  These definitions, and the qualifying language "together with," make clear that "office and storage use" only form part of the purpose of the Lease when subordinate or supplementary to general retail use.  The Lease does not contemplate, and Free People did not agree to pay more than $120,000 per month to, use the Leased Space solely as an office or warehouse.  Morgan Cert., Ex. 20, (Yaegel Dep. Tr. 58:21-59:4) ("We have a lease to operate a retail location which includes storing inventory in the space. . . Part of the process of running a

---

[10] https://www.merriam-webster.com/dictionary/ancillary.

retail store is having storage area available for customer inventory."); (*Id.* at 172:10-13) ("[P]art of operating a retail store is having a storage area for moving inventory from back stock to the sales floor, but it's not intended as a storage area.").

Nor does the fulfillment of certain orders placed at Free People's website with merchandise from the 9th Ave. Store amount to using the Leased Space as Free People intended or operating its business therefrom. The "Permitted Uses" section of the Lease is silent with respect to shipping merchandise purchased elsewhere, and Delshah acknowledges that it understood "at the inception of the lease, that Free People intended to operate a commercial store." Morgan Cert., Ex. 2 (Shah Dep. Tr. 111:2-4). Limited e-commerce fulfillment services are distinct from the retail business which Free People operated at the Leased Space, until it was prevented from doing so by the COVID-19 Pandemic and Shutdown Order.

  2. <u>The Shutdown Order was an "action or decree of any lawful power or authority."</u>

The Shutdown Order required Free People to reduce its in-person workforce at the 9th Ave. Store by 100% as of 8 p.m. on March 22, 2020. Morgan Cert., Ex. 16 (Executive Order No. 202.8). By virtue of the Shutdown Order and related Executive Orders, no customers were allowed inside the Leased Space until June 22, 2020. SMF ¶ 81. It is undisputed that the Executive Orders issued by Governor Cuomo and Mayor De Blasio in response to the COVID-19 Pandemic, including the Shutdown Order, were "decrees of a lawful power or authority." SMF ¶ 34.

**B. As a Result of the "Taking," The Rent Otherwise Owed Was Reduced by One Hundred Percent (100%).**

Pursuant to Section 20(a), when a "taking" occurs and "the taking is not deemed 'temporary,'" the Lease shall "as to the part that is subject to the taking, terminate as of the date Tenant is denied or deprived of such possession, use, occupancy, enjoyment and/or operation of the Leased Space, and the Rent due hereunder shall be reduced proportionately by the square

footage of the Leased Space that is so affected." Morgan Cert., Ex. 1 (Lease) § 20(a).  Section 20(d) of the Lease further provides that a taking shall be deemed "temporary" if "as of the date on which such taking commenced, Tenant has the expectation that, with three-hundred sixty-five (365) days after the taking," Tenant's "possession, use, occupancy, enjoyment and operation" of the Leased Space will be restored.  Morgan Cert., Ex. 1 (Lease) § 20(d).  "In the event of a temporary taking, Rent shall be reduced as aforesaid, and Tenant's other obligations under this Lease shall be suspended, for the duration thereof."  *Id.*

Free People acknowledges that the "taking" was a "temporary taking" within the meaning of Section 20.  Accordingly, for the duration of the taking, the "Rent"[11] which Free People would otherwise owe was reduced as set forth in Section 20(a)—proportionately by the square footage of the Leased Space impacted by the taking.  Morgan Cert., Ex. 1 (Lease) §§ 20(a).  Here, the impact of the taking on the 9th Ave. Store's retail operations was total.  For three months, no customers were allowed to enter the 9th Ave. Store.  For three months, Free People could not operate its retail business from the Leased Space.  As a result, under Section 20 of the Lease, the rent otherwise owed by Free People to Delshah was reduced by one-hundred percent (100%) between March 23, 2020 and June 22, 2020, and Free People's other obligations under the Lease were suspended.

## II.   FREE PEOPLE DOES NOT OWE DELSHAH ANY RENT OR OTHER DAMAGES.

The Court should grant Free People summary judgment on Count II of its Second Amended Counterclaims, which requests a declaration that Free People does not owe Delshah rent either prior to or post-termination of the Lease, and deny Delshah's claim for damages for rent in Counts I and III of the Second Amended Complaint.  The undisputed facts show that Free People does not

---

[11] The Lease defines Rent to include Minimum Rent and all sums payable and collectible as Additional Rent.  Morgan Cert., Ex. 1 (Lease) § 3(e).

owe Delshah rent for any period prior to or post-termination of the Lease. Furthermore, because Free People did not default on any of its obligations, Delshah is not entitled to any damages under Section 22 of the Lease.

### A.   Delshah Was Not Owed Any Rent Pre-Termination.

Delshah terminated the Lease on June 10, 2020, pursuant to the May 28, 2020 Termination Notice. Morgan Cert., Ex. 41 (Termination Notice) ("[P]ursuant to the Lease and all applicable provisions of law, Tenant's tenancy at the Leased Space is hereby terminated effective June 10, 2020 upon the grounds that Tenant is violating substantial obligations of Tenant's tenancy."). In the Termination Notice, Delshah asserted that $197,681.62, representing Minimum Rent and Additional Rent for April and May 2020, was due and owing as of May 28, 2020. Morgan Cert., Ex. 41 (Termination Notice) at 2. Delshah was incorrect. On May 28, 2020, Delshah was not owed *any* rent for April or May 2020, because a taking had occurred by virtue of the COVID-19 Pandemic and the Shutdown, reducing Free People's rent obligations to zero for the duration of the taking. *See* Point I, *supra*. In fact, on May 28, 2020, Free People had a negative balance of approximately $103,327.61, consisting of the real estate taxes overcharge, the portion of the March 2020 rent payment attributable to the period in which the 9th Ave. Store was required to be closed and the advance payment on or about May 15, 2020. *See* Exhibit A hereto.

### B.   Delshah Is Not Owed Any Rent Post-Termination.

Nor is Delshah owed any rent for the period between the termination of the Lease and Free People's surrender of the Leased Space. As of June 1, 2020, the Shutdown Order was still in effect and Free People did not owe rent, as discussed above. The taking ended on June 22, 2020, when the 9th Ave. Store was allowed to reopen to customers, albeit at a limited capacity with certain restrictions in place. SMF ¶¶ 45, 81. At that time, nine days remained in June, for which Free People would have owed $37,500.72, or approximately $4,166.75 per day. Deducting that amount

from Free People's balance still left Free People with a negative balance of $65,826.89.  On June 29, 2020, Free People paid rent for July in the amount of $123,864.37.  SMF ¶ 82.  After receiving the Verified Complaint in July 2020, Free People vacated the Leased Space with a negative balance still owed to it.  Subsequently, Free People inadvertently remitted the Erroneous Payments to Delshah, which increased the amount owed to Free People by Delshah by $247,728.74, for a total of $311,636.33.  *See* Exhibit B hereto.  As discussed in Points III and IV, *infra*, Free People is entitled to recover these monies.

C.     **Delshah Is Not Entitled to Termination Damages.**

In Count III of its Second Amended Complaint, Delshah seeks "Money Damages Based on Termination of Lease" under Section 22 of the Lease.  Second Amended Complaint ¶¶ 66-89. Section 22 of the Lease, however, only applies "[i]f an Event of Default as defined in **Section [21]** hereof shall have occurred and is continuing[.]"  Morgan Cert., Ex. 1 (Lease) § 22(a).  Under Section 21(a), an Event of Default occurs if "Tenant fails to pay any installment of Rent that is due and payable hereunder by Tenant . . . ."  No such failure occurred, therefore Section 22 is inapplicable.  As set forth above, Free People was not obligated to pay rent for April, May or June 2020 because a taking had occurred under Section 20 of the Lease.  When the taking ended on June 22, 2020, Free People's balance was more than sufficient to cover the remainder of the month. Free People paid rent for July 2020 and then vacated the Leased Space by July 31, 2020, as Delshah demanded and sought in the Termination Notice and Verified Complaint.  No rent was owed for August 2020 or any time thereafter, for the simple reason that Free People's tenancy had been terminated and it ceased to occupy the Leased Space.

In various of its Affirmative Defenses, Delshah argues that Free People "waived" the Termination Notice and ratified or revived the Lease by:  (1) "continuing to occupy the Premises and to conduct its retail business during June and July 2020"; and (2) "voluntarily and

unconditionally remitting rent for the months of June, July, August, September, and October 2020." [Docket No. 28 - Answer to Second Amended Counterclaims, Second, Third and Fourth Affirmative Defenses].  Delshah's arguments are baseless.

First, Free People did not waive its right to vacate the Leased Space post-termination by waiting to move out until the month after it received the Termination Notice.  After serving the Termination Notice, Delshah continued to discuss a potential resolution with Free People.   On June 5, 2020, Mr. Shah proposed a 50% deferral of the rent Delshah contended was owed for the period during which the 9th Ave. Store was closed by government order.  SMF ¶ 80.  When relaying this proposal, he wrote:  "Let's speak to see if we can work something out quickly, because otherwise, unfortunately, we will need to start enforcement actions."  *Id.*  No resolution was reached and, on June 29, 2020, Delshah filed the Verified Complaint.  SMF ¶ 83.  In the Verified Complaint, Delshah:  (i) alleged that the Lease had been terminated; (ii) alleged that Free People remained in possession of the Leased Space "past the Termination Date, without Landlord's consent"; and (iii) sought nearly $11 million in termination damages.  Morgan Cert., Ex. 42 (Verified Complaint) at 5-8.  Free People did not receive the Verified Complaint until July 2, 2020.  SMF ¶ 86.  Thereafter, Free People reached the conclusion that, notwithstanding the improper termination, it was required to mobilize its personnel despite the ongoing pandemic and vacate the Leased Space before the end of the month.  SMF ¶ 87.

The Lease expressly states that "[n]o delay or omission by Landlord in exercising any right upon any Event of Default by Tenant, or by Tenant in exercising any right upon any default by Landlord, will impair such right or be construed as a waiver thereof[.]"  Morgan Cert., Ex. 1 (Lease) § 28.  Delshah, presumably, does not believe it waived its right to sue Free People for any alleged default by waiting nearly three weeks from the Termination Date to file the Verified

Complaint.  Similarly, Free People did not waive its right to vacate the Leased Space (as the Termination Notice instructed it to do) by waiting until negotiations had failed and Delshah filed a lawsuit alleging that it wrongfully remained in possession of the Leased Space.

Furthermore, the suggestion that a tenant whose tenancy has been terminated can unilaterally revive the lease by remaining in possession is fundamentally at odds with basic principles of landlord-tenant law.  Were that the case, it would be impossible to evict a holdover tenant following a termination, as, by continuing to occupy the premises despite the revocation of permission to do so, they would have revived the terminated lease simply by refusing to leave. Rather, where a tenant holds over and continues to make rental payments which the landlord accepts, the parties' relationship is limited to a month-to-month tenancy.  *See* N.Y. Real Prop. Law § 232-c ("Where a tenant whose term is longer than one month holds over after the expiration of such term, such holding over shall not give to the landlord the option to hold the tenant for a new term solely by virtue of the tenant's holding over."); *Akivis v. Drucker*, 177 A.D.2d 349, 350 (1st Dep't 1991) (affirming lower court's decision that, where defendants remained in possession of property after expiration of a written lease, "a month-to-month tenancy had been created, and that defendants could thus not be held liable for rental obligations for a new five year term.").

Nor can the rent payments referenced in Delshah's affirmative defenses be said to have revived the terminated Lease.  As an initial matter, contrary to Delshah's claims, Free People did not remit rent payments, voluntarily or otherwise, for June or October 2020.  As of June 1, 2020, the 9th Ave. Store was still closed to retail customers.   By October 1, 2020, the Lease had been terminated and Free People had been out of the Leased Space for more than two months.  No payments were made for either of those time periods.

At the time Free People paid rent for July 2020, the 9th Ave. Store had reopened and Free People did not yet know that Delshah was suing it for termination damages.  Following Free People's receipt of the Verified Complaint on July 2, 2020, Free People did not "voluntarily and unconditionally" make any more rent payments to Delshah.  [Docket No. 28 - Answer to Second Amended Counterclaims, Second, Third and Fourth Affirmative Defenses].  To the contrary, Free People put a hold on the payment for August.  SMF ¶ 99.  When Urban Outfitters' Lease Administration Manager went to cancel the payment in September, Free People's accounts payable inadvertently released the payment instead.  SMF ¶ 105.  In the interim, Free People had made a second Erroneous Payment to Delshah, again because individuals, working remotely under extremely challenging circumstances, made a mistake.  SMF ¶ 105.  The uncontroverted evidence, in the form of contemporaneous emails and deposition testimony, demonstrates that these Erroneous Payments were made unintentionally.  Waiver is therefore inapplicable.  *See Gilbert Frank Corp. v Federal Ins. Co.*, 70 N.Y.2d 966, 968 (1998) ("Waiver is an intentional relinquishment of a known right and should not be lightly presumed.").

The court's decision in *Scarborough Manor Owners Corp. v. Robson*, 59 N.Y.S.3d 877, 880 (N.Y. App. Term. 2d Dep't 2017) is instructive.  In that case, the landlord's board of directors instructed its managing agent to terminate a tenant's tenancy for violations of the building code and not to accept any rents.  *See id.* at 879.  Unbeknownst to the landlord and its managing agent, the tenant deposited the unsolicited check into a bank lock box.  *See id.*  Under these circumstances, the court found that it was "clear that there was no intention by landlord to waive the termination notice."  *Id.*  As such, the landlord's managing agent's failure to identify and return the rent check "cannot . . . be deemed to vitiate the notice of termination."  *Id.* (citing *Matter of Georgetown Unsold Shares, LLC v. Ledet*, 130 A.D.3d 99, 105 (2d Dep't 2015) ("Since the very essence of a

waiver is the intentional relinquishment of a known right, a waiver cannot be created via negligence, oversight, or thoughtlessness.")).

Here, Free People's employees were similarly instructed to hold and ultimately cancel future payments to Delshah.  SMF ¶¶ 99-105.  Two payments were nevertheless released through a combination of negligence and oversight.  Accidental and unknowing conduct of this nature cannot, as a matter of law, result in a waiver of the Termination Notice.  *See Scarborough*, 59 N.Y.S.3d at 879.

In conclusion, Free People did not waive Delshah's termination of the Lease, and no rent or other damages are owed for any period pre- or post-termination.

## III. DELSHAH BREACHED THE LEASE BY DEMANDING RENT IT WAS NOT OWED, FAILING TO REIMBURSE FREE PEOPLE AND WRONGFULLY TERMINATING THE LEASE.

Free People is also entitled summary judgment on Count V of the Second Amended Counterclaim, as Delshah breached the Lease by demanding payments that were not due under the lease, failing to return payments made during periods in which Free People did not owe any rent, and terminating the Lease wrongfully and without cause.

### A.    Delshah Breached the Lease by Demanding Rent That Was Not Due.

In the first instance, Delshah breached the Lease by demanding rent while Free People was unable to operate the 9th Ave. Store due to the COVID-19 Pandemic and the Shutdown Order.  It is undisputed that Delshah was aware of the COVID-19 Pandemic and Free People's inability to operate its business at the Leased Space.  SMF ¶¶ 63-64.  In those circumstances, the Lease is clear—the rent otherwise owed is reduced to zero for the duration of the taking.  Morgan Cert., Ex. 1 (Lease) §§ 20(a), (d).  Demand for performance when none is owed constitutes breach of contract.  *See, e.g., Nelson v. Hatch,* 70 A.D. 206, 210 (1st Dep't 1902) (observing that breach occurred when defendants wrongfully claimed plaintiff was in default and demanded payment not

-30-

due under the contract); *see also Christman v. Maristella Compania Naviera,* 349 F. Supp. 845, 858 (S.D.N.Y. 1971) (holding that shipowner's demand of $10,000 not allocated for in original charter party constituted breach).  Accordingly, Delshah's wrongful demands in the Nonpayment Notices for payment of rent which had been excused constitute breach of Section 20 of the Lease.

## B.     Delshah Breached the Lease by Failing to Reimburse Free People for Rent Which Was Not Owed.

Delshah also breached Section 20 of the Lease by failing to reimburse Free People for the excess payments Free People made during periods in which no rent was owed.  New York courts have held that a plaintiff can recover overpayments or other payments that have not been reimbursed by the defendant under a breach of contract cause of action.  *See, e.g., Marte v. Graber,* 924 N.Y.S.2d 720, 721-22 (N.Y. App. Term 2d Dep't 2011) (holding that plaintiff's claim for a refund of overpayments sounded in breach of contract and denying motion to dismiss); *Boscov's Department Stores, LLC v. AKS Intern. AA Corp.,* No. 01 Civ.10580, 2004 WL 205825, at *1-2 (S.D.N.Y. Feb. 4, 2004) (granting summary judgment on plaintiff's claim for breach of contract arising from overpayment).

Delshah breached the Lease by failing to refund or reimburse Free People for the rent attributable to periods during which it was unable to operate its business in March.  Specifically, from March 23, 2020 to March 31, 2020, Free People was unable to use or operate its business from the Leased Space pursuant to the Shutdown Order.  Morgan Cert., Ex. 16 (Executive Order No. 202.8); SMF ¶ 44.  Free People had previously paid rent for the entire month of March in full. SMF ¶ 61.  Under the Section 20 of Lease, Delshah was not owed any rent for the nine-day period in March in which Free People was unable to use the Leased Space or operate its business therefrom.  Morgan Cert., Ex. 1 (Lease) § 20(a).  However, Delshah failed to return this

overpayment or give Free People a rent credit (Morgan Cert., Ex. 9 (Delshah's Tenant Ledger)) thereby breaching the Lease.

Delshah's treatment of the payment made on or about May 15, 2020 also represents a breach of the Lease.  As correspondence from Free People preceding the payment expressly stated, the payment "represent[s] half of the rent for the first month our store is able to open to the public." Morgan Cert., Ex. 36 (May 7 Correspondence); *see also* Ex. 38 (May 9 Email) ("This payment is for the month we are able to reopen.").  The 9th Ave. Store was not able to open to the public until June 22, 2020, however Delshah wrongfully allocated the payment to a balance which was not owed.  SMF ¶¶ 75, 81.  Free People is entitled to the return of these funds.

**C.    Delshah Also Breached the Lease by Wrongfully Terminating the Lease Without Cause.**

Delshah's wrongful termination of the Lease also constitutes breach of contract.  Under the Lease, Delshah may only terminate the Lease where there has been an "Event of Default" by Free People.  Morgan Cert., Ex. 1 (Lease) § 22(a).  An "Event of Default" occurs when "Tenant fails to pay any installment of Rent that is due and payable hereunder by Tenant . . . ."  Morgan Cert., Ex. 1 (Lease) § 21(a).  When Delshah issued the Termination Notice on May 28, 2020, no installments of rent were due and payable to Delshah by operation of Section 20, as discussed in Points I and II.A, *supra*.  By terminating the Lease when no "Event of Default" existed, Delshah breached the Lease and should be held liable therefor.  *See Stivers v. Brownell*, 63 A.D.3d 1516, 1518 (4th Dep't 2009) (granting tenant's motion for summary judgment on breach of contract claim where landlord terminated the lease without adhering to the lease's terms for doing so); *Gulf Ins. Co. v. Fidelity & Deposit Co. of Md.*, 16 Misc.3d 1116[A], 2007 WL 2162885, at *4 (Sup. Ct., N.Y. County 2007) ("Where a contract provides that a party must fulfill specific conditions precedent before it can

terminate the agreement, those conditions are enforced as written and the party must comply with them.")

### D.      Free People Was Damaged by Delshah's Breaches of the Lease.

As a result of Delshah's breaches of the Lease, Free People incurred damages in an amount not less than $62,327.02, which represents the overpayment attributable to March 23 to March 31, 2020 ($36,291) and the May 15, 2020 advance payment ($63,536.73), less the rent owed for June 2020 following the 9th Ave. Store's reopening on June 22 ($37,500.71).  This amount does not include interest or attorneys' fees owed under Sections 40 and 41 of the Lease, respectively.

## IV.    DELSHAH WAS UNJUSTLY ENRICHED BY THE ERRONEOUS PAYMENTS.

Summary judgment should be awarded to Free People on Count VII of its Second Amended Counterclaims because Delshah has been wrongfully and unjustly enriched by Free People's Erroneous Payments in August and September 2020.

Under New York law, a plaintiff will prevail on a claim for unjust enrichment where it shows that: "(1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered." *City of Almaty v. Sater*, 503 F. Supp. 3d 51, 59 (S.D.N.Y. 2020) (quoting *Mandarin Trading Ltd. v. Wildenstein,* 16 N.Y.3d 173, 182 (2011)).  A claimant does not need to be in privity with an unjust enrichment defendant, but the relationship between the claimant and the defendant must not be "too attenuated."  *See id.* at 59-61.  And while unjust enrichment "does not require the performance of any wrongful act by the one enriched . . . . [w]hat is required, generally, is that a party hold property under such circumstances that in equity and good conscience he ought not to retain it."  *Simonds v. Simonds*, 45 N.Y.2d 233, 242 (1978) (internal quotations and citations omitted).

In the specific context of mistaken payments, New York law holds that "'a party who has made a mistaken payment to another based upon a unilateral mistake of fact may recover the payment unless the payee has changed his position to his detriment in reliance upon the mistaken payment.'" *National Bank of Canada v. Artex Industries, Inc.*, 627 F.Supp. 610, 614 (S.D.N.Y.1986) (quoting *Bank Saderat Iran v. Amin Beydown, Inc.*, 555 F.Supp. 770, 773 (S.D.N.Y.1983)); *see also Banco Popular North American v. Lieberman*, 871 N.Y.S.2d 798, 799 (1st Dep't 2008). "The law permitting a person to recover for monies paid by mistake is based upon the principle of unjust enrichment." *Blue Cross of Central New York, Inc. v. Wheeler*, 461 N.Y.S.2d 624, 626 (4th Dep't 1983). One who is unjustly enriched at the expense of another is required to make restitution to the other. *Id.*

Here, Free People mistakenly made two payments to Delshah in August and September 2020, totaling $247,728.74. SMF ¶¶ 99-105. These payments were one-off errors—the first resulting from Ms. Zoller's failure to cancel all future payments to Delshah despite being instructed to do so, and the second resulting from the accounts payable department's mistaken release of a payment previously placed on hold. SMF ¶¶ 99-105. While Free People may have been neglectful in failing to cancel one payment and mistakenly releasing another, it is well-settled "that money paid under a mistake of fact may be recovered back however negligent that party paying may have been in making the mistake." *A.I. Trade Finance, Inc. v. Bank*, No. 89-7987, 1997 WL 291841, at *3 (S.D.N.Y. June 2, 1997) (quoting *National Bank of Canada v. Artex Industries, Inc.*, 627 F.Supp. 610, 614 (S.D.N.Y. 1986)).

Delshah did not change its position to its detriment in reliance on either of the Erroneous Payments. At the time the first Erroneous Payment was received, Free People had been out of the Leased Space for nearly a month. SMF ¶ 88. Lantern, Delshah's real estate broker, had prepared

-34-

marketing materials and started discretely marketing the Leased Space.  SMF ¶ 94.  Delshah did

not cease its re-leasing efforts once it received the Erroneous Payments.  To the contrary, by

September Lantern was actively marketing the Leased Space to potential new tenants.  SMF ¶ 94.

At no point did Delshah instruct Lantern to stop marketing the Leased Space.  Morgan Cert., Ex.

50 (Seigel Dep. Tr. 112:24-113:5).  Delshah may have been confused about why Free People

appeared to be making rent payments after Delshah terminated the Lease and Free People moved

out (Morgan Cert., Ex. 54 (Amirian Dep. Tr. 94:10-95:12)), but it had no reason to believe that

Free People planned to resume its tenancy.  Indeed, any claim by Delshah that it justifiably relied

on the Erroneous Payments is belied by contemporaneous communications from Free People, in

which Free People affirmed that the Lease had been terminated and demanded the return of the

Erroneous Payments.  Morgan Cert., Exs. 56, 57, 63 (9/10/20 Letter from W. Connolly; 9/28/20

Letter from W. Connolly; 10/9/20 Letter from W. Connolly).

      The other defenses raised by Delshah to Free People's claim for unjust enrichment are also

unavailing.  Free People's claim is not barred by the voluntary payment doctrine (Twelfth

Affirmative Defense), as the doctrine "does not apply . . . when a plaintiff made payments under a

mistake of fact or law regarding the plaintiff's contractual duty to pay."  *Spagnola v. Chubb Corp.*,

574 F.3d 64, 72 (2d Cir. 2009).  Here, the Erroneous Payments were not "made with full knowledge

of the facts," but rather under the mistaken belief that payments to Delshah had been put on hold

and/or cancelled following the termination of the Lease and Free People's surrender of the Leased

Space.  *Kirby McInerney & Squire, LLP v. Hall Charne Burce & Olson, S.C.*, 790 N.Y.S.2d 84

(1st Dep't 2005) (holding that voluntary payment doctrine did not apply "where the overpayments

were clearly made to defendants based on a mistake of fact, namely, the amount of fees actually

owed by plaintiff to defendants.").

Nor is Free People's claim for unjust enrichment barred because "the parties are parties to a valid contractual relationship" and/or the payments "were proper obligations under the Lease to which Landlord was contractually entitled."   [Docket No. 28 - Answer to Second Amended Counterclaims, Fifteenth and Sixteenth Affirmative Defenses].   At the time the Erroneous Payments were rendered, the Lease was terminated and Free People was no longer in possession of the Leased Space.   As such, there was no contract governing the payments or contractual entitlement to payment.

Lastly, the so-called "discharge for value" rule does not preclude the relief sought by Free People.   As the Court of Appeals of New York has explained, the "discharge for value" rule provides that:

> A creditor of another or one having a lien on another's property who has received from a third person any benefit in discharge of the debt or lien, is under no duty to make restitution therefor, although the discharge was given by mistake of the transferor as to his interests or duties, if the transferee made no misrepresentation and did not have notice of the transferor's mistake.

*Banque Worms v. BankAmerica Int'l*, 77 N.Y.2d 362, 367 (1991) (quoting § 14(a) of the Restatement (First) of Restitution).   In other words, a creditor can retain erroneously received funds if it accepted such funds "in good faith in the ordinary course of business and for a valuable consideration."   *Id.* at 372.   Here, the rule is inapplicable because Delshah was not owed any debt by Free People at the time the Erroneous Payments were made and it did not provide any consideration in exchange therefor.   The Lease was terminated and Free People had moved out of the Leased Space.   Free People did not owe any obligations to Delshah, which is why Delshah was bewildered when it received the Erroneous Payments.   Morgan Cert., Ex. 54 (Amirian Dep. Tr. 94:10-95:12).   Delshah may not have been aware of the exact mistake which led to the payments being made, but it could not have believed that Free People intended to go on paying rent after

moving out and taking the position, in correspondence and court pleadings, that the Lease was terminated and that it had no obligations to Delshah. Morgan Cert., Exs. 45, 56, 57, 63 (7/31/20 Letter from W. Connolly; 9/10/20 Letter from W. Connolly; 9/28/20 Letter from W. Connolly; 10/9/20 Letter from W. Connolly); see also Answer and Counterclaims [Docket No. 25].

## V.  UPON PREVAILING, FREE PEOPLE IS ENTITLED TO ATTORNEYS' FEES.

Finally, upon prevailing on the claims discussed above, Free People is entitled to summary judgment on Count VIII of its Second Amended Counterclaims, for attorneys' fees and costs, while Delshah's claim for attorneys' fees in Count IV of the Second Amended Complaint should be denied.

Section 41 of the Lease provides:

> If either Landlord or Tenant shall institute any action or proceeding against the other relating to any of the terms, covenants, conditions or provisions of this Lease, or there occurs any Event of Default by Tenant or default by Landlord, the unsuccessful party in such action or proceeding shall reimburse the successful party for reasonable attorney's fees and other costs and expenses incurred therein by the successful party, including fees, costs and expenses incurred in any appellate proceeding.

Morgan Cert., Ex. 1 (Lease) § 41.

Free People has incurred attorneys' fees, costs and expenses in connection with Delshah's breach of the Lease and this action.  SMF ¶ 112.  Upon a judgment from this Court awarding summary judgment to Free People, Free People will promptly file a fee application for a determination of reasonableness.

## CONCLUSION

For all of the foregoing reasons, Free People respectfully requests that the Court grant Free People summary judgment on Counts I, II, III and IV of Delshah's Second Amended Complaint and Counts I, II, V, VII and VIII of Free People's Second Amended Counterclaims.

Dated:   New York, New York
        October 18, 2021

**FAEGRE DRINKER BIDDLE & REATH LLP**

*/s/ Brian P. Morgan*
Brian P. Morgan
1177 Avenue of the Americas
41st Floor
New York, New York 10036
Telephone: (212) 248-3140
Facsimile: (212) 248-3141

-and-

William M. Connolly (admitted *pro hac vice*)
One Logan Square, Suite 2000
Philadelphia, PA 19103
Telephone: (215) 988-2700
Facsimile: (215) 988-2757

*Attorneys for Free People of PA LLC*
*n/k/a URBN US Retail LLC*