UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DELSHAH 60 NINTH, LLC,

                              Plaintiff,                    CIVIL ACTION NO. 20 Civ. 5905 (JMF) (SLC)

          -v-                                              **REPORT AND RECOMMENDATION**

FREE PEOPLE OF PA LLC,

                              Defendant.

**SARAH L. CAVE**, United States Magistrate Judge.

**TO THE HONORABLE JESSE M. FURMAN**, United States District Judge:

## I.    INTRODUCTION

In March 2015, Plaintiff Delshah 60 Ninth, LLC ("Delshah") and Defendant Free People of

PA LLC ("Free People") entered into a lease of retail space located at 58-60 Ninth Avenue in New

York, New York (the "Leased Space").  (ECF No. 67-18 at 5–72 (the "Lease")).  When the COVID-19

Pandemic hit New York City and retail businesses were shut down as the result of governmental

orders, Free People was limited in its use of the Leased Space and went into arrears on its rent.

Delshah terminated the Lease, Free People vacated the Leased Space, and litigation ensued.

(See § II, infra).

Substantially adopting my report and recommendation, the Honorable Jesse M. Furman

granted Delshah's motion for summary judgment on its breach of contract claims and on all but

one of Free People's affirmative defenses (ECF Nos. 67 ("Delshah's MSJ")), denied Free People's

cross-motion for summary judgment (ECF No. 72 ("Free People's MSJ," with Delshah's MSJ, the

"MSJs")), and referred the matter for an inquest on damages.  (See ECF Nos. 114, 119, 131).  See

Delshah 60 Ninth, LLC v. Free People of PA LLC, No. 20 Civ. 5905 (JMF) (SLC), 2022 WL 4228213

(S.D.N.Y. June 29, 2022) ("Delshah I"), adopted in part and modified in part, 2022 WL 3536133 (S.D.N.Y. Aug. 17, 2022) ("Delshah II"), amended on reconsideration in part, 2022 WL 5108049 (S.D.N.Y. Oct 4, 2022) ("Delshah III").[1]  Following extensive pre-hearing submissions from the parties, an inquest hearing (the "Hearing"), and post-Hearing submissions, the Court respectfully recommends that: (1) Delshah be awarded damages in the amount of $5,956,144.10, with prejudgment interest calculations to be updated as of the date of Judge Furman's decision and with postjudgment interest under 28 U.S.C. § 1961, and (2) the question of attorneys' fees and costs continue to be deferred until after that decision.

## II.   BACKGROUND

### A. Factual Background[2]

The factual background set forth in Delshah I and adopted by Judge Furman in Delshah II is incorporated by reference.  See Delshah II, 2022 WL 3536133, at *1, 5; Delshah I, 2022 WL 4228213, at *1–11.  The Court sets forth the factual background pertinent to damages, and continues to employ the terms defined in Delshah I.

#### 1. Termination of the Lease

On April 30, 2020, after Free People failed to pay Rent for April and May 2020, Delshah served Free People with a "Notice to Tenant of Landlord's Failure to Receive Rent," stating that Free People owed Rent for March 1, 2020 through April 30, 2020 in the amount of $134,978.36. Delshah I, 2022 WL 4228213, at *8 (citing ECF Nos. 75-35 at 1, 11 (the "April 30 Notice"); 81

---

[1] Internal citations and quotation marks are omitted from case citations unless otherwise indicated.
[2] The factual background is based on the undisputed material facts and exhibits the parties submitted in connection with the MSJs and the exhibits submitted for the Hearing.  (ECF Nos. 67-2 – 67-40; 68-1; 81; 82-1 – 82-14; 75-1 – 75-63; 88; 164-1; 166-1).

at 15 ¶ 45; 88 at 14 ¶ 66).  During May 2020, the parties discussed possible "solutions" to Free People's Rent arrears, and on May 15, 2020, Free People made a payment of $63,536.73 (the "May Payment"), unaccompanied by any instructions, to Delshah, which applied the payment to Free People's "oldest" balance.  Id. at *9 (citing ECF Nos. 67-23 at 8–9; 67-35 at 10 (the "May 7 Notice"); 67-36 at 9; 75-39 at 2; 81 at 17–18 ¶ 55; 88 at 16 ¶ 74).

On May 28, 2020, Delshah sent two notices to Free People (the "May 28 Notices"):  (i) a "Notice to Tenant of Landlord's Failure to Receive Rent[,]" stating that Free People owed $197,791.58 in past due rent for April 1, 2020 through May 20, 2020, and (ii) a "Seven (7) Day Notice of Termination[,]" stating that Delshah was terminating the Lease effective June 10, 2020 due to Free People's failure to pay past-due rent and instructing Free People to vacate and surrender possession of the Leased Premises by that date.  Delshah I, 2022 WL 4228213, at *9 (citing ECF Nos. 75-40 at 1; 75-41 at 1–2; 81 at 32 ¶¶ 113–14; 88 at 16–17 ¶¶ 76–79).  Free People did not vacate Store 1846 by June 10, 2020.  Id. (citing ECF Nos. 67-26 at 26–27; 81 at 33 ¶¶ 117–18).  Thus, as of June 10, 2020, Free People "was in default under the Lease entitling Delshah to terminate."  Id. at *15; see Delshah II, 2022 WL 3536133, at *3 (holding that "Delshah's termination of the [L]ease following Free People's undisputed failure to pay rent" was "permissible") (citing Delshah I, 2022 WL 4228213, at *15); see also Delshah I, 2022 WL 4228213, at *19 (finding that, "given Free People's failure to pay rent more than ten days after the May 28 Notices, Free People was in default, entitling Delshah to terminate the Lease effective June 10, 2020").

On June 5, 2020, Delshah offered to defer 50% of Free People's rent for April, May, and June 2020, to be repaid from July to December 2020 in six equal installments, or from September

to December 2020 in three installments.  Delshah I, 2022 WL 4228213, at *9 (quoting ECF No. 75-34 at 1).  On June 29, 2020, without any written instructions, Free People sent a payment of $123,864.37 (the "June Payment"), which Delshah applied to Free People's oldest open balance.  Id. (citing ECF Nos. 67-22 at 2; 67-23 at 9; 67-28 at 3; 67-29 at 5; 75-29 at 4; 81 at 33 ¶ 119).

The same day Free People sent the June Payment, Delshah filed the State Court Action, asserting that, by means of the May 28 Notices, Delshah had terminated the Lease effective June 10, 2020 due to Free People's default under § 21(a) of the Lease for failure to pay rent. Delshah I, 2022 WL 4228213, at *9 (citing ECF No. 75-42 at 6–7 ¶¶ 12–22).  Delshah sought to recover $328,097.00 in back rent, plus attorneys' fees and costs.  Id. (citing ECF No. 75-42 at 7–9 ¶¶ 23–33).  On July 2, 2020, Delshah sent a copy of the complaint in the State Court Action to Free People's counsel.  Id. (citing ECF Nos. 75-43 at 2; 88 at 18 ¶ 86).

"[B]ased on Delshah's termination of the Lease and filing of the State Court action," Free People decided, by July 27, 2020, to vacate Store 1846, and by July 31, 2020, removed its inventory.  Delshah I, 2022 WL 4228213, at *10 (citing ECF Nos. 67-21 at 15; 69 at 16–17; 81 at 35–37 ¶¶ 127, 129, 133, 137; 82-1 at 6–7; 82-10 at 5–7; 88 at 18–19 ¶ 87).  On July 31, 2020, Free People's counsel sent a letter to Delshah's counsel stating that Free People had "vacated the [L]eased [S]pace . . . as of July 31, 2020[,]" and asked how to return the keys.  Id. (citing ECF Nos. 75-45 (the "July 31 Letter"); 88 at 19 ¶ 89).  At Delshah's instruction, on August 17, 2020, Free People delivered the keys to the Leased Space along with built plans and photos.  Id. (citing ECF Nos. 75-46 at 1; 75-47 at 1; 75-48 at 1; 75-49 at 1).

On August 27, 2020 and again on September 22, 2020, Free People made payments of $123,864.37 each (the "August Payment" and the "September Payment").   Delshah I, 2022 WL 4228213, at *10 (citing ECF Nos. 67-22 at 2; 75-29 at 5–6; 75-30 at 7; 81 at 18 ¶ 58). Free People did not indicate how these payments should be applied, but Delshah accepted them and applied the amount to Free People's oldest outstanding balance.  Id. (citing ECF Nos. 67-39 at 15; 81 at 40–41 ¶¶ 148, 151; 83 at 2 ¶ 6).

Notwithstanding its statements in the May 28 Notices and the State Court Action, on August 31, 2020, Delshah asserted that Free People's "continued possession and payment of rent after [June 10, 2020] . . . vitiated" Delshah's termination of the Lease.   Delshah I, 2022 WL 4228213, at *10 (citing ECF Nos. 67-36 at 36; 75-55 at 1).  Free People rejected Delshah's asserted vitiation of the May 28 Notices, but Delshah continued to assert that it had withdrawn the May 28 Notices and the Lease remained in effect.  Id. at *11 (citing ECF Nos. 67-36 at 38; 75-56).

On October 9, 2020, Free People demanded that Delshah return the August Payment and the September Payment, and thereafter, did not pay rent for October, November, or December 2020, the total of which is $386,254.33.   Delshah I, 2022 WL 4228213, at *11 (citing ECF Nos. 67-36 at 41; 75-57 at 1–2; 81 at 42 ¶ 152).  On December 9, 2020, Delshah served two notices on Free People:  (i) "Notice to Tenant of Landlord's Failure to Receive Rent[,]" and (ii) a "Seven (7) Day Notice of Termination" (the "Dec. 9 Notices"), demanding payment of $386,254.53.  Id. (citing ECF Nos. 67-36 at 30–33, 40–43; 88 at 24 ¶ 111).

### 2.   Damages Available for Free People's Default Under the Lease

Section 22(d) of the Lease provides that, on Delshah's election to terminate, Free People

must surrender the Leased Space and must pay Delshah the sum of the following:

(i)  The worth at the time of award of any unpaid rent which has been earned at the time of such termination; plus

(ii)  The worth at the time of award of the amount by which the unpaid rent which would have been earned after termination until the time of award exceeds the amount of such rental loss that [Free People] proves could have been reasonably avoided; plus

(iii)  The worth at the time of award of the amount by which the unpaid rent for the balance of the Lease Term after the time of award exceeds the amount of such rental loss that [Free People] proves could have been reasonably avoided; plus

(iv)  Any other amount reasonably necessary to compensate [Delshah] for all the detriment proximately caused by [Free People's] failure to perform its obligations under this Lease or which in the ordinary course of things would be likely to result therefrom, specifically including reasonable broker's fees and advertising expenses incurred by [Delshah] in connection with reletting the whole or any portion of the Leased Space, the reasonable costs incurred in removing and/or storing [Free People's] property, the cost of repairing, altering, remodeling, or otherwise putting the Leased Space into condition acceptable to a new tenant or tenants, whether for the same or a different use, economic incentives accepted by replacement tenants, and all other reasonable expenses incurred by [Delshah] in enforcing [its] remedies; plus

(v)  At [Delshah's] election, such other amounts in addition to or in lieu of the foregoing as may be permitted from time-to-time by applicable Law.

(ECF No. 75-1 at 35–36 §§ 22(d)(i)–(v)).  In the event of termination of the Lease, Delshah agreed

"to use commercially reasonable efforts to relet the Leased Space in order to mitigate the

damages that will otherwise be incurred because of such early termination or repossession."

(Id. § 22(e)).  The Lease describes the applicable interest rate and provides for a two percent late

fee.  (Id. §§ 22–23, 40).

### 3.   Releasing of the Leased Space

In early August 2020, Delshah began efforts to re-lease the Leased Space by working with

a broker, Lantern, which prepared a marketing brochure and sometime "around" Labor Day

undertook a "quiet campaign" to market the Leased Space.  (ECF No. 143-1 at 4–5).  By September 8, 2020, Lantern was "actively marketing" the Leased Space, and through the end of 2020, conducted weekly calls with Delshah, prepared multiple target tenant lists, and solicited interest in the Leased Space with at least three potential tenants.  (Id. at 6, 9; 143-2 at 6–13; 147-1 at 123).  On January 8, 2021, Shah told Lantern that Free People's Lease was "officially terminated for non payment[,]" stating, "[w]e should use efforts to mitigate our damages[,]" and instructing Lantern to "send a listing agreement, generate marketing materials and start marketing the space."  (ECF No. 147-2 at 2; see ECF No. 147-1 at 115).  Not until March 2, 2021 did Delshah sign a listing agreement with Lantern, whose activities had thus far been "covered" under a prior agreement.  (ECF Nos. 143-2 at 6; 147-1 at 117–18).

On April 20, 2021, Chelsea Wine Co. ("Chelsea Winery") offered to purchase the Leased Space, which Delshah rejected as "not aligned with the reality of the physical property[.]"  (ECF No. 147-1 at 135).  At Delshah's invitation, on May 10, 2021, Chelsea Winery submitted a lease proposal.  (ECF Nos. 144-1 at 15; 147-1 at 135–36).  More than one year later, on May 23, 2022, Delshah entered into a lease with Chelsea Winery for the ground floor of the Leased Space commencing on August 1, 2022 and expiring on July 31, 2034, and a parallel lease for the lower level with Chelsea Market Events, Inc. ("Chelsea Events").  (ECF Nos. 140-1 (the "Chelsea Winery Lease"); 140-2 (the "Chelsea Events Lease," together the "Chelsea Leases")).[3]  Delshah did not receive any other offers to purchase or lease the Leased Space.  (ECF No. 143-1 at 10).  In relevant part, the Chelsea Winery Lease provides for Annual Base Rent and Monthly Rent as follows:

---

[3] On May 4, 2022, Lantern and Avison Young-New York LLC, Chelsea Winery's broker, entered into a co-broker agreement with respect to the Leased Space.  (ECF No. 143-5 (the "Lantern Agreement")).

| Period | Annual Base Rent | Monthly Base Rent |
|---|---|---|
| August 1, 2022 – July 31, 2023 (Lease Year 1) | $862,500.00 | $71,785.00 |
| August 1, 2023 – July 31, 2024 | $888,375.00 | $74,031.25 |
| August 1, 2024 – July 31, 2025 | $915,026.00 | $76,252.17 |
| August 1, 2025 – July 31, 2026 | $942,478.00 | $78,539.75 |
| August 1, 2026 – July 31, 2027 | $970,751.00 | $80,895.92 |
| August 1, 2027 – July 31, 2028 | $999,874.00 | $83,322.83 |

(ECF No. 140-1 at 8; see ECF No. 174 at 3).  The Chelsea Events Lease provides for Annual Base

Rent and Monthly Rent as follows:

| Period | Annual Base Rent | Monthly Base Rent |
|---|---|---|
| August 1, 2022 – July 31, 2023 (Lease Year 1) | $287,500.00 | $23,958.33 |
| August 1, 2023 – July 31, 2024 | $296,125.00 | $24,677.08 |
| August 1, 2024 – July 31, 2025 | $305,009.00 | $25,417.42 |
| August 1, 2025 – July 31, 2026 | $314,159.00 | $26,179.92 |
| August 1, 2026 – July 31, 2027 | $323,584.00 | $26,965.33 |
| August 1, 2027 – July 31, 2028 | $333,292.00 | $27,774.29 |

(ECF No. 140-2 at 8).

On execution of the Chelsea Leases, Chelsea Winery and Chelsea Events were each to pay

Delshah one month's Monthly Base Rent.  (ECF Nos. 140-1 at 8; 140-2 at 8).  In addition to the

Monthly Base Rent, Chelsea Winery was to pay Delshah a "Percentage Rent" equal to ten percent

of the amount by which Chelsea Winery's gross sales each year exceed $4,500,000.00; for

Chelsea Events, the gross sales threshold for Percentage Rent was $1,500,000.00 each year.

(ECF Nos. 140-1 at 10 ¶ 2.A; 140-2 at 10 ¶ 2.A).  In late October 2022—i.e., after Judge Furman

held in Delshah II that Free People was liable for breach of contract damages—Delshah amended

the Chelsea Leases to adjust the commencement date to November 1, 2022.  (ECF Nos. 140-3;

140-4; 143-3; 178 at 64, 69).  As a result of the amendments, Chelsea Winery and Chelsea Markets

received six—rather than the initial three—months of free rent.  (ECF Nos. 142 at 13; 175-1 at 14; 178 at 64).

Before entering into the Chelsea Leases, Chelsea Winery and Chelsea Markets had leased space in the Chelsea Market, "a well-known tourist destination and a consumption food mall" that "attracts many thousands of tourists and visitors annually."  (ECF No. 136 ¶ 3; see ECF No. 138 ¶ 4).  In 2019, Chelsea Winery's annual sales totaled $5,101,209.00, but in 2020, dropped to $2,501,298.00, and in 2021, to $1,542,508.00.  (ECF No. 136 ¶ 4).  Chelsea Events' gross sales dropped from $214,487.48 in 2019 to $20,271.88 in 2020, then rebounded to $516,651.34 in 2021.  (ECF No. 138 ¶ 6).  Chelsea Events did not operate in 2022.  (Id. ¶ 6).  After Chelsea Market declined to renew leases with Chelsea Winery and Chelsea Events in May 2022, Chelsea Winery and Chelsea Events learned of the availability of the Leased Space and ultimately entered into the Chelsea Leases "because of the urgent need for a new, near-by location" despite the lack of a "steady stream of tourists and customers" and the presence of construction awnings at an adjacent property.  (Id. ¶¶ 6–7; ECF No. 138 ¶ 7).  "[W]ithin the first five years" of the Chelsea Leases, Chelsea Winery and Chelsea Events do "not anticipate generating [] a level of gross sales" at the Percentage Rent thresholds.  (ECF Nos. 136 ¶ 8; 138 ¶ 8).[4]

---

[4] On December 8, 2023, more than two months after the closure of the record following the Hearing and without prior permission, Delshah submitted a letter with supporting exhibits advising that it had terminated the Chelsea Leases due to non-payment of rent and had filed holdover petitions against both Chelsea Winery and Chelsea Events. (ECF Nos. 180; 180-1; 180-2). Delshah asked the Court to take judicial notice of certain media articles and argued that the default of Chelsea Winery and Chelsea Events (i) increased its Section 22(d)(ii) damages by $451,500.00 through November 30, 2023 plus $98,708.33 per month through the date of judgment, and (ii) precluded an offset of $1,058,997.61 for percentage rent. (ECF No. 180 at 2). Free People asked the Court to disregard Delshah's filing and explained why the failure of Chelsea Winery and Chelsea Events to pay rent was not dispositive and should not alter the Court's damages calculation. (ECF No. 182 at 1–2). The Court addresses these arguments below. (See § IV.A.2.b, infra).

## B. **Procedural Background**

On July 29, 2020, Free People removed the State Court Action to this Court, and the action was assigned to the Honorable Alison J. Nathan.  (ECF Nos. 1; 81 at 33 ¶ 120; 88 at 20 ¶ 95; ECF min. entry July 30, 2020).   On August 14, 2020, Free People filed its Answer and Counterclaims.  (ECF Nos. 4; 88 at 20 ¶ 96).  On September 25, 2020, Delshah filed an Amended Complaint, and on October 5, 2020, an answer to Free People's counterclaims.  (ECF Nos. 12–13).

On January 28, 2021, Delshah filed the Second Amended Complaint (the "SAC"), which added references to the Dec. 9 Notices.  (ECF No. 24 at 17–18 ¶¶ 77–81).  In its answer to the SAC, Free People asserted counterclaims for declaratory relief, specifically, that it did not owe rent by operation of (i) the Taking Clause, (ii) Delshah's wrongful termination of the Lease, (iii) frustration of purpose, and (iv) impossibility of performance, as well as counterclaims for breach of contract, money had and received, and unjust enrichment.  (ECF No. 25 at 24–43).

The MSJs were fully briefed by December 17, 2021 and were referred for report and recommendation.  (ECF Nos. 60; 67; 72; 79–80; 86; 90–91).  On April 10, 2022, the action was reassigned to Judge Furman.  (ECF min. entry Apr. 10, 2022).[5]  On June 29, 2022, I issued Delshah I, recommending that summary judgment be granted in favor of Delshah on the breach of contract claims and on Free People's taking, impossibility, and frustration affirmative defenses; denied without prejudice as to Delshah's request for attorneys' fees and costs; and denied as to Free People.  Delshah I, 2022 WL 4228213, at *22.  Free People filed objections, to which Delshah responded.  (ECF Nos. 115; 117).

---

[5] At the direction of Judge Furman, Free People filed an amended notice of removal stating the citizenship of each constituent person comprising Delshah.  (ECF Nos. 99; 105).

On August 17, 2022, Judge Furman issued <u>Delshah II</u>, holding that <u>Delshah I</u> was "substantially correct and adopt[ing] its primary conclusions[,]" and rejecting Free People's objections concerning Delshah's breach of contract claim and Free People's breach of contract, breach of lease, and unjust enrichment claims.  <u>Delshah II</u>, 2022 WL 3536133, at *1–4.  Judge Furman also rejected Free People's defenses of failure of consideration, mistake, and unconscionability; granted summary judgment in Delshah's favor on "all of Free People's affirmative defenses[,]" and referred the matter for an inquest on damages.  <u>Id.</u> at *5. On Free People's subsequent motion for reconsideration, Judge Furman "deemed reinstated" Free People's "failure-to-mitigate defense[,]" noting that this defense "is relevant only to damages" and anticipating that "mitigation can and will be addressed by Magistrate Judge Cave as part of the inquest given the terms of the parties' [L]ease." <u>Delshah III</u>, 2022 WL 5108049, at *1.

In response to the Court's instructions, the parties met and conferred and submitted a proposed schedule for the inquest process, which the Court adopted and later extended at the parties' request.  (ECF Nos. 120; 125–26; 133–34).  On November 16, 2022, Delshah submitted a brief in support of its claim for damages, accompanied by several declarations and exhibits.  (ECF Nos. 135–40).  Among the exhibits Delshah submitted was the expert report of Sharon Locatell ("Ms. Locatell").  (ECF No. 137-1 (the "First Locatell Report")).  On November 28, 2022, Free People submitted its brief concerning damages, accompanied by several declarations and exhibits.  (ECF Nos. 14245).  Among the exhibits Free People submitted were the expert reports of Thomas J. Tener ("Mr. Tener").  (ECF Nos. 144-1; 144-2 (the "First Tener Reports")).  On December 8, 2022, Delshah submitted a reply brief.  (ECF No. 146).

On July 5, 2023, the Court held a conference with the parties to discuss their damages submissions as well as:  (i) deferral of calculation of attorneys' fees and costs that Delshah had incurred in this action, (ii) joint stipulated facts, (iii) oral argument and/or testimony from witnesses, and (iv) settlement.  (ECF Nos. 151; 155).  Following the conference, the Court scheduled the September 19, 2023 Hearing, directed Delshah to submit a revised report from Ms. Locatell that excluded attorneys' fees and costs for this action, and permitted Free People to submit a revised report from Mr. Tener.  (ECF No. 152).  On July 21, 2023, Delshah submitted a revised expert report from Ms. Locatell (ECF No. 159-1 (the "Second Locatell Report")), and on August 18, 2023, Free People submitted a revised report from Mr. Tener (ECF No. 162-1 (the "Second Tener Report")).  After reviewing the parties' submissions, the Court determined that live testimony was not required; rescheduled the Hearing to September 22, 2023; directed the parties to submit a joint list of exhibits; and invited the parties to submit demonstratives for use at the Hearing.  (ECF No. 163).[6]  At the Court's direction, the parties also submitted several additional exhibits.  (ECF Nos. 164–66).

On September 22, 2023, the Court held the Hearing, at which Free People presented demonstrative slides.  (ECF Nos. 175-1; 178).  During the Hearing, it became apparent that several figures in the parties' proposed damages calculations required correction.  (ECF No. 178 at 38, 70, 100).  At the Court's direction (ECF No. 171), on October 6, 2023, the parties submitted a revised joint demonstrative exhibit comparing their respective damages calculations. (ECF Nos. 177; 177-1; 177-2).

---

[6] At the Court's direction, the parties submitted Microsoft Excel versions of calculations in the experts' reports.  (Id. ¶ 3).

### III.   <u>LEGAL STANDARDS</u>

#### A. <u>Damages Inquest</u>

Because Judge Furman granted summary judgment in favor of Delshah, this inquest is limited to a review of whether Delshah has presented sufficient evidence to enable the Court to ascertain damages with reasonable certainty.  See <u>Yiwu Lizhisha Accessories Co. v. JJamz, Inc.</u>, No. 16 Civ. 6418 (JPO) (SN), 2019 WL 2775605, at \*2 (S.D.N.Y. June 14, 2019) (citing <u>N.Y. Dist. Council of Carpenters Pension Fund v. Perimeter Interiors, Inc.</u>, 657 F. Supp. 2d 410, 422 (S.D.N.Y. 2009)), <u>adopted by</u>, 2019 WL 2763841 (S.D.N.Y. July 2, 2019); <u>see also</u> <u>Credit Lyonnais Sec. (USA), Inc. v. Alcantara</u>, 183 F.3d 151, 155 (2d Cir. 1999).  Delshah bears the burden to establish its damages.  See <u>Lenard v. Design Studio</u>, 889 F. Supp. 2d 518, 527 (S.D.N.Y. 2012) (explaining that, on inquest, "plaintiff must [] substantiate a claim with evidence to prove the extent of damages"), <u>adopted by</u>, 889 F. Supp. 2d 518 (S.D.N.Y. 2012).  "A court may evaluate the fairness of a proposed damages award by relying on affidavits and documentary evidence."  <u>Allstate Ins. Co. v. Nazarov</u>, No. 11 Civ. 6187 (PKC) (VMS), 2015 WL 5774459, at \*15 (E.D.N.Y. Sept. 30, 2015) (citing <u>Cement & Concrete Workers Dist. Council Welfare Fund v. Metro Found. Contractors Inc.</u>, 699 F.3d 230, 234 (2d Cir. 2012)).

#### B. <u>Breach of Contract Damages</u>

Under New York law, the interpretation of a clear and unambiguous lease term is a matter of law to be decided by the Court.  <u>In re Sept. 11 Litig.</u>, No. 21 Misc. 101 (AKH), 2017 WL 1287141, at \*11 (S.D.N.Y. Apr. 6, 2017) (citing <u>W.W.W. Assocs., Inc. v. Giancontieri</u>, 77 N.Y.2d 157, 162 (1990)).  "When parties set down their agreement in a clear, complete written document, their writing should be interpreted as a whole and enforced according to its terms."  <u>Id.</u> (citing <u>S. Rd.</u>

Assocs., LLC v. IBM, 4 N.Y.3d 272, 277 (2005)).  These principles are "particularly important in the context of real property transactions, where commercial certainty is a paramount concern, and where the instrument was negotiated between sophisticated, counseled business people negotiating at arm's length."  S. Rd. Assocs., 4 N.Y.3d at 277.

"'The general rule for measuring damages for breach of contract . . . is the amount necessary to put the plaintiff in the same economic position [it] would have been in had the [d]efendant fulfilled [its] contract.'"  Asesoral Bus. Partners, LLC v. Seatech Worldwide Corp., No. 19 Civ. 11512 (AJN) (SLC), 2021 WL 6755016, at *5 (S.D.N.Y. Dec. 16, 2021) (quoting Bos. Sci. Corp. v. New York Ctr. For Specialty Surgery, No. 14 Civ. 6170 (RRM), 2015 WL 13227994, at *3 (E.D.N.Y. Aug. 31, 2015)), adopted by, 2022 WL 1265945 (S.D.N.Y Apr. 28, 2022); accord Burns v. Scott, 635 F. Supp. 3d 258, 279 (S.D.N.Y. 2022), adopted by, 635 F. Supp. 3d 258 (S.D.N.Y. 2022).  Contract damages "must be not merely speculative, possible, and imaginary, but they must be reasonably certain and such only as actually follow or may follow from the breach of the contract."  Tractebel Energy Mktg. v. AEP Power Mktg., 487 F.3d 89, 110 (2d Cir. 2007).  While Delshah was "'required to mitigate damages upon breach, the burden of proving a lack of diligent effort to mitigate damages is upon'" Free People.  Wilkinson v. R. MacDonald Elec., Inc., No. 03 Civ. 6441 (JWF), 2006 WL 8456460, at *2 (W.D.N.Y. July 10, 2006) (quoting Cornell v. T.V. Dev. Corp., 17 N.Y.2d 69, 74 (1966)).

## IV.   DISCUSSION

### A.  Calculation of Damages

For the reasons discussed below, I find that the Hearing, combined with the documentary evidence the parties submitted, is sufficient to ascertain damages, including mitigation, with

reasonable certainty.  The Court first addresses three threshold factual issues that the parties acknowledge impact the award of damages (ECF Nos. 135 at 13–15; 142 at 5–6; 175-1 at 3, 28), before turning to the calculation of damages under Section 22(d) of the Lease.

### 1.  Threshold Issues

Three threshold issues impact the calculation of Delshah's damages:  (i) the date of termination of the Lease, (ii) the commercial reasonableness of Delshah's efforts to re-market the Leased Space, and (iii) the likelihood of Delshah's receipt of Percentage Rent under the Chelsea Leases.  (ECF Nos. 135 at 5, 10 n.3, 13, 18–19; 142 at 4–5, 10–11, 21, 23–24; 146 at 4–8; see generally ECF Nos. 175-1; 178).  The Court makes the following conclusions as to these issues.

### a.  Termination of the Lease

The parties have vigorously disputed the date of termination of the Lease.  See Delshah I, 2022 WL 4228213, at *11.  Delshah argues that the termination date is "December 17, 202[0]," the date specified in the Dec. 9 Notices.  (ECF Nos. 135 at 13–15; 178 at 8–9, 12).[7]  Delshah argues that Free People's failure to vacate the Leased Space by June 10, 2020 (the termination date in the May 28 Notices), continued payment of Rent (which Delshah accepted), and expensing of the August and September Payments "vitiated" the May 28 Notices (ECF Nos. 67-36 at 36; 75-55 at 1) such that the landlord-tenant relationship resumed after June 10, 2020 and continued until Delshah terminated the Lease for a second time by issuing the Dec. 9 Notices and terminating the Lease effective December 17, 2020.  (ECF No. 135 at 13–15).  Delshah cites Atkin's Waste Materials v. May, in which the New York Court of Appeals recognized that a landlord's

---

[7] In yet another example of the errors endemic to Delshah's submissions, Delshah asserts three times that termination was on "December 17, 2022."  (ECF No. 135 at 13–14).

"acceptance of the rent" after a tenant's default "is in effect an election by the landlord to continue the relationship of landlord and tenant."  34 N.Y.2d 422, 427 (1974).  (See ECF No. 135 at 14).

Free People argues that the termination Date is June 10, 2020, the date specified in the May 28 Notices.  (ECF No. 142 at 10, 15–16).  Free People points principally to its decision to vacate the Leased Space on July 31, 2020 in response to the May 28 Notices.  (Id. at 10).  In addition, Free People cites this Court's statement in Delshah I that, "given Free People's failure to pay rent more than ten days after the May 28 Notices, Free People was in default, entitling Delshah to terminate the Lease effective June 10, 2020." (Id. at 16 (quoting Delshah I, 2022 WL 4228213 at *19)).  Free People also relies on Judge Furman's dismissal of Free People's unjust enrichment claim in Delshah II because "[t]he lease provisions governing post-termination rent appl[ied]" given that Free People made the August and September Payments "after it vacated the premises and Delshah terminated the parties' [L]ease."  (Id. (quoting Delshah II, 2022 WL 3536133, at *3)).  Free People contends that, while the date of termination might have been a disputed fact in the MSJs, Delshah has not submitted any additional facts that warrant the Court revising the finding in Delshah I and Delshah II that the Lease terminated on June 10, 2020.  (ECF No. 178 at 78–79).

The Court declines to depart from the finding in Delshah I and Delshah II that the Lease terminated on June 10, 2020 for three reasons.  First, although Delshah argued in its MSJ that it "vitiated" the May 28 Notices (ECF No. 69 at 16, 19, 22), Judge Furman and I rejected that argument and deemed the Lease terminated as of June 10, 2020.  As I explained, "given Free People's failure to pay rent more than ten days after the May 28 Notices, Free People was in

default, entitling Delshah to terminate the Lease effective June 10, 2020." Delshah I, 2022 WL 4228213, at *19; see id. at *15 (explaining that, after Free People failed to pay Rent for April, May, and half of June 2020, it "was in default under the Lease entitling Delshah to terminate"). Delshah did not object to these findings—and in fact did not object at all (ECF No. 117)—which Judge Furman adopted in Delshah II as the basis of his holdings that "Delshah's termination of the [L]ease following Free People's undisputed failure to pay rent[,]" and that the "[L]ease provisions governing post-termination rent appl[ied]" and precluded Free People's unjust enrichment claims to recover the August and September Payments, which "follow[ed] termination." Delshah II, 2022 WL 3536133, at *3 (citing Delshah I, 2022 WL 4228213, at *19). When Free People moved for reconsideration of Delshah II, Delshah did not challenge any of Judge Furman's findings or conclusions. See Delshah III, 2022 WL 5108049. Delshah has not introduced any new facts germane to this issue that were not previously presented and considered in the MSJs, and the time to do so—if such facts existed—has long expired. See S.D.N.Y. Loc. Civ. R. 6.3. It is therefore law of the case that the termination of the Lease occurred on June 10, 2020, and Delshah's repetition of arguments the Court has rejected does not provide a cogent or compelling basis to hold otherwise. See Simpson v. Wells Fargo Bank, No. 15 Civ. 1487 (JMF), 2016 WL 10570967, at *2 (S.D.N.Y. Dec. 15, 2016) (holding that court's prior interpretations of insurance policy precluded subsequent claims based on same policy); Starr Indem. & Liab. Co. v. Am. Claims Mgmt., 131 F. Supp. 3d 185, 188 (S.D.N.Y. 2015) (declining to consider "arguments that the Court previously—and repeatedly—rejected"); Dandong v. Pinnacle Performance Ltd., 966 F. Supp. 2d 374, 387 (S.D.N.Y. 2013) (holding that law of the case required rejection of "exact arguments" that the court had rejected in a prior order).

Second, even if I were to reconsider the factual record, I would continue to find that the termination of the Lease occurred on June 10, 2020.  That is the date Delshah chose as the termination date in the May 28 Notices, and Free People vacated the Leased Space within a few weeks thereafter and returned the keys in the manner that Delshah had instructed. (ECF Nos. 75-40 at 1; 75-41 at 1–2).  In the State Court Action, Delshah affirmatively alleged that the termination of the Lease occurred on June 10, 2020.  (ECF No. 75-42 at 6–7 ¶¶ 12–22).  When Free People made the August and September Payments, it did not indicate to which month they applied, and Delshah applied them to Free People's outstanding balance, a portion of which remained despite the two payments.  (ECF Nos. 81 at 40 ¶ 148; 178 at 9).  Free People's witnesses credibly testified that the August and September Payments were mistakes, which was reinforced by the fact that Free People had vacated the Leased Space and attempted to claw the payments back.  (ECF Nos. 75-30 at 7–8, 14; 75-51; <u>see</u> ECF Nos. 67-22 at 2; 75-29 at 5–6).  Furthermore, within a week of Free People vacating the Leased Space, Delshah instructed Lantern to begin marketing efforts.  (ECF Nos. 143-1 at 4–5; 143-2 at 16).  While Free People "expensed" the August and September Payments, Delshah did not learn that fact until this litigation. (ECF Nos. 67-39 at 15; 81 at 41 ¶ 151; 83 at 2 ¶ 6).  Rather, Delshah's own actions in June, July, and early August 2020—engaging with Lantern, instructing Free People how to return the keys, and asserting in the State Court Action that the Lease was terminated on June 10, 2020— undermine its self-serving claims that the May 28 Notices were "vitiated."  (ECF No. 135 at 14).

Third, the cases on which Delshah relies do not undermine the Court's finding that the Lease terminated on June 10, 2020.  (ECF No. 135 at 14).  In <u>TSS-Seedman's, Inc. v. Elota Realty Co.</u>, the landlord "accepted all withheld rent prior to service of the termination notices and thus

the rental delinquencies were remedied," such that the subsequent termination notices, which the landlord "sent at a later time when there were no outstanding rental defaults to which the notices could apply, [] were ineffective."  72 N.Y.2d 1024, 1027 (1988).  Here, as Delshah admits (ECF Nos. 75-42 at 6–7 ¶¶ 12–22; 178 at 9), from April 2020 onward, Free People was in arrears, was in default as of June 10, 2020, and remained in default even after the August and September Payments.  See Delshah II, 2022 WL 3536133, at *3.  The landlord who continued to deliver scrap to its tenant was deemed to waive any default in May, 34 N.Y.2d at 427, was thus distinguishable from Delshah, which made clear its continued non-waiver of Free People's breach of the Lease for failing to pay rent by, among other things, filing the State Court Action and filing this action.

Accordingly, the Court maintains the finding in Delshah I and Delshah II that the Lease was terminated on June 10, 2020 (the "Termination Date").

### b.  Delshah's Mitigation of Damages

Free People alleged as an affirmative defense that Delshah failed to use commercially reasonable efforts to mitigate its damages (ECF Nos. 25 at 19), a defense which, as Judge Furman explained, pertains not to liability but to the calculation of damages.  Delshah III, 2022 WL 5108049, at *1.  Free People contends that, while Lantern, at Delshah's direction, "began desultory efforts to market the Leased Space in August 2020," Lantern "showed no sense of urgency." (ECF No. 142 at 10–11).  Free People's expert, Mr. Tener, opines that, had the Leased Space "been effectively marketed beginning in August 2020, it would have had a very high probability of being leased by August 2021 at" the annual market rent of $1,428,000. (ECF No. 144-1 at 4).  He bases his opinion on observations that:  (i) the Leased Space was vacant by July 31, 2020, but was not listed until early September 2020; (ii) Delshah did not formally

engage Lantern until March 2021; (iii) the storefront was covered in brown paper that obscured the view of the interior; (iv) no visible signs were posted advertising availability for leasing or Lantern's contact information; and (v) Delshah permitted a restaurant in an adjacent building to install a sidewalk cafe in front of the entrance to the Leased Space.  (ECF No. 144-1 at 4–5).  Mr. Tener concludes that the Leased Space was not "effectively marketed from its earliest availability, putting it at a disadvantage relative to other spaces available in the immediate market." (ECF No. 144-1 at 5).  He opines that, had Delshah used commercially reasonable efforts beginning in August 2020, there is a "very high probability" that the Leased Space would have been re-leased within twelve months of Free People vacating the premises, i.e., by August 2021, at a higher market rental rate.  (ECF Nos. 144-1 at 4, 56, 65; 162-1 at 8 n.9).  Finally, Free People points out that even Ms. Locatell, Delshah's expert, acknowledges that the Leased Space reasonably could have been rented by February 2022, three months sooner than Delshah entered into the Chelsea Leases.  (ECF No. 175-1 at 10; see ECF No. 148-1 at 41 (Ms. Locatell opining that Leased Space could have been released "within approximately 18 months of August 1, 2020[,]" i.e., February 2022)).

Delshah responds that Mr. Tener is not qualified under Federal Rule of Evidence 702 and Daubert[8] to "render opinions on real estate marketing practices, much less statistical probabilities based on variations in such practices."  (ECF No. 146 at 4–5; see ECF No. 178 at 3–4, 24–26).  Delshah also criticizes Mr. Tener for failing "to identify any methodology, much less one established as reliable in the field of real estate market analytics," and for "translat[ing] a single data point concerning the general probability of leasing to a specific time period that a

---

[8] Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993).

specific property could have been leased with 'high probability.'" (ECF No. 146 at 5). Delshah instead points to the testimony of Matthew Siegel, a broker at Lantern, concerning the pandemic-related circumstances that brought marketing the Leased Space "into a very different retail landscape than [they] were in 2019[.]" (Id. at 6 (quoting ECF No. 143-1 at 10); see ECF No. 178 at 24, 26, 28, 94).

Here, the Lease required Delshah, in the event of termination, "to use commercially reasonable efforts to relet the Leased Space in order to mitigate the damages that will otherwise be incurred because of such early termination or repossession." (ECF No. 75-1 at 36 ¶ 23(e)). Because the Lease does not define "commercially reasonable efforts," the Court recognizes that "[t]he standard for satisfying commercial reasonability under New York law is a fairly lenient one[.]" Shane Campbell Gallery, Inc. v. Frieze Events, Inc., 441 F. Supp. 3d 1, 4 (S.D.N.Y. 2020); accord InspiRX, Inc. v. Lupin Atlantis Holdings SA, 554 F. Supp. 3d 542, 556 (S.D.N.Y. 2021). "Compliance with a 'commercially reasonable efforts' clause requires at the very least some conscious exertion to accomplish the agreed goal, but something less than a degree of efforts that jeopardizes one's business interests." Holland Loader Co. v. FLSmidth A/S, 313 F. Supp. 3d 447, 473 (S.D.N.Y. 2018), aff'd, 769 F. App'x 40 (2d Cir. 2019) (summary order). "At a minimum, [] a promise to use commercially reasonable efforts requires that the promising party undertake at least some activity[,]" that is, "at the very least some conscious exertion to accomplish the agreed goal, but something less than a degree of efforts that jeopardizes one's business interests." Id. The standard is an objective, not a subjective, one. Id. at 471 (collecting cases); see id. at 473 ("A contracting party's efforts are judged objectively in light of proven standards."). The burden rests with Free People "to establish the objective standard by which

[Delshah's] efforts are to be judged, in the context of the particular industry." Id. at 472 (collecting cases holding that party seeking to enforce commercially reasonable efforts clause bears burden to establish standard).

Applying this standard, the Court finds that Free People has not met its burden to establish that Delshah failed to "undertake at least some activity" to re-lease the Leased Space to mitigate its damages under Section 22(e) of the Lease. Holland Loader, 313 F. Supp. 3d at 473 (emphasis added). Here, the record demonstrates that by August 7, 2020—within a week of Free People vacating the Leased Space—Delshah had commenced weekly calls with Lantern and instructed Lantern to develop a marketing brochure. (ECF No. 143-2 at 16). Lantern did so, and by September 8, 2020, was "actively marketing" the Leased Space. (Id. at 13). By October 2020, Lantern had identified and begun direct outreach to potential tenants. (Id. at 11). Through the end of 2020 and early 2021, at least five potential tenants received information about and/or toured the Leased Space. (Id. at 6–11). By mid-March 2021, Lantern's efforts bore fruit, as Chelsea Winery emerged, and by June 2021, Delshah was in "ongoing negotiation[s]" to "encourage their tenancy." (ECF No. 147-1 at 136; see ECF No. 143-2 at 6). Free People's expert, Mr. Tener, acknowledges as much, citing negotiations between Delshah and Chelsea Winery that started in April 2021. (ECF No. 144-1 at 15). By any objective measure, Delshah, with Lantern's assistance, promptly engaged in "some conscious exertion" to re-lease the Leased Space to mitigate its damages. Holland Loader, 313 F. Supp. 3d at 473.

The Court also concludes that Mr. Tener has failed to provide an objective standard of commercially reasonable marketing, let alone demonstrate that the composite of Delshah's

efforts to re-lease the Leased Space summarized above fell below any such standard.[9]  Mr. Tener

merely relies on a conversation with another person, Robin Abrams of Abrams Retail Strategies

("Ms. Abrams"), and critiques the appearance of the Leased Premises to opine that the Leased

Space had a "very high probability of being leased by August 2021[.]"  (ECF No. 144-1 at 4).  In

addition to Free People's failure to provide any qualifications or expertise of Ms. Abrams to justify

viewing her as an expert concerning commercial reasonableness, Delshah is correct that the

Court must disregard such "parrot[ing]" of the opinion of another expert.  Quiles v. Bradford-

White Corp., No. 10 Civ. 747 (TJM), 2012 WL 1355262, at *7 (N.D.N.Y. Apr. 8, 2012); see Joint

Stock Co. Channel One v. Infomir LLC, No. 16 Civ. 1318 (GBD) (BCM), 2021 WL 4810266, at *15

(S.D.N.Y. Sept. 30, 2021) (explaining that expert could not serve as a mouthpiece for non-

testifying witnesses); Malletier v. Dooney & Bourke, Inc., 525 F. Supp. 2d 558, 564 (S.D.N.Y. 2007)

(explaining that expert "cannot simply be a conduit for the opinion of an unproduced expert"),

adopted in relevant part by, 525 F. Supp. 2d 558 (S.D.N.Y. 2007); see also In re M/V MSC Flaminia,

No. 12 Civ. 8892 (KBF), 2017 WL 3208598, at *2 (S.D.N.Y. July 28, 2017) (explaining that expert

may rely on opinions of other experts whose work "the expert supervised, directed, or

participated in that work, and if the expert is qualified in the field and could perform the work

themselves").  Nor does Mr. Tener provide any accepted methodology by which to conclude that

---

[9] Because the Court deems Mr. Tener's opinions to be substantively deficient on the question of commercial reasonableness, it will not consider them for that reason, such that a full Daubert analysis is unnecessary.  (ECF No. 178 at 3–4, 28 (asking the Court to exclude Mr. Tener's opinions under Daubert standard)).  See United States v. Kwong, 69 F.3d 663, 668 (2d Cir. 1995) (deeming Daubert analysis unnecessary where other grounds justified exclusion of expert opinions); In re Gen'l Motors LLC Ignition Switch Litig., No. 15 Civ. 1626 (JMF), 2017 WL 6729295, at *11 n.8 (S.D.N.Y. Dec. 28, 2017) (deeming Daubert analysis unnecessary where court declined to consider experts' opinions on other grounds); see also Nat'l Envelope Corp. v. Am. Pad & Paper Co. of Del., No. 06 Civ. 12988 (SHS) (RLE), 2009 WL 5173920, at *5 (S.D.N.Y. Dec. 30, 2009) (deeming Daubert analysis unnecessary where opinion did not "involve junk science or new scientific methods").

affixing paper in the windows, displaying deficient signage, or impeding sidewalk visibility rendered Delshah's efforts, in total, commercially unreasonable.  See EEOC v. Bloomberg L.P., No. 07 Civ. 8383 (LAP), 2010 WL 3466370, at *12 (S.D.N.Y. Aug. 31, 2010) (excluding expert whose methodology was unsupported by objective evidence or recognized in the field); Malletier, 525 F. Supp. 2d at 637 (excluding expert who failed to provide objective and recognized support for methodology); Figueroa v. Bos. Sci. Corp., 254 F. Supp. 2d 361, 365 (S.D.N.Y. 2003) (explaining that "expert basing his opinion solely on experience must do more than aver conclusorily that his experience led to his opinion"); Lippe v. Bairnco Corp., 288 B.R. 678, 689 (S.D.N.Y. 2003) (excluding experts whose opinions were "based solely on their say-so"), aff'd, 99 F. App'x 274 (2d Cir. 2004) (summary order).  At most, Mr. Tener's proffered opinions amount to an observation, "in hindsight, that [Delshah] could have done something differently that would have produced a better result."  Bear, Stearns Funding, Inc v. Interface Grp.-Nev., Inc., No. 03 Civ. 8259 (CSH), 2007 WL 1988150, at *22 (S.D.N.Y. July 10, 2007).  The Lease, however, only required Delshah to take "commercially reasonable efforts" (ECF No. 75-1 at 36 ¶ 23(e)), "not perfect actions that achieved maximum returns."  InspirRX, 554 F. Supp. 3d at 562.

Accordingly, the Court concludes that Free People has failed to show that Delshah's marketing efforts, which began in August 2020 and culminated in entry of the Chelsea Leases in May 2022 at the combined annual base rent commencing at $1,150,000.00,[10] were not commercially reasonable.

---

[10] $862,500.00 (ECF No. 140-1 at 8) + $287,500.00 (ECF No. 140-2 at 8).

**c.  Percentage Rent Provision in Chelsea Leases**

The parties dispute whether Percentage Rent under the Chelsea Leases should be included or excluded from the calculation in Section 22(d)(iii).  (See ECF Nos. 135 at 17–19; 142 at 23–25; 146 at 9–10; 175-1 at 6, 18; 177-1 at 2; 178 at 31, 50, 82–86).  Ms. Locatell, Delshah's expert, excluded from her calculations under Section 22(d)(iii) any Percentage Rent under the Chelsea Leases whatsoever.  (ECF No. 159-1 at 10–11).  Mr. Tener, Free People's expert, using historical sales figures from Chelsea Winery, "conservatively assumed that" Chelsea Winery's sales would remain "flat" through the end of 2023 and then grow at a rate of three percent per year.  (ECF Nos. 142 at 24; 162-1 at 10).  Mr. Tener contemplates that Percentage Rent payments would begin in the first quarter of 2023 and total $1,228,064.00 over the remaining term of the Lease.  (ECF No. 162-1 at 10; see ECF No. 142 at 24).

The Court begins from a basic principle of contractual damages that once the non-breaching party has demonstrated the amount of damages with reasonable certainty, the party in breach bears the risk of any uncertainty concerning the calculation of that amount.  Kovens v. Paul, No. 04 Civ. 2238 (TPG), 2009 WL 562280, at *7 (S.D.N.Y. Mar. 4, 2009), aff'd, 358 F. App'x 228 (2d Cir. 2009) (summary order); see Bigelow v. RKO Radio Pictures, 327 U.S. 251, 264–65 (1946) ("The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created.").  Similarly, the non-breaching party may only recover those damages "attributable" to the breach and may not recover "speculative damages" that "are not the certain result of the wrong."  Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 562 (1931); see Golden Unicorn Enters., Inc. v. Audible, Inc., No. 21 Civ. 7059 (JMF), 2023 WL 4561718, at *7 (S.D.N.Y. July 14,

2023) (excluding expert opinion regarding damages that were not "attributable" to defendant's breach). "The general rule is, that all damages resulting necessarily and immediately and directly from the breach are recoverable, and not those that are contingent and uncertain." <u>Story Parchment Co.</u>, 282 U.S. at 563. When the uncertainty is caused by the defendants' own wrongful act, "justice and sound public policy alike require" that the defendant "bear the risk of the uncertainty thus produced." <u>Id.</u> at 565; <u>see</u> <u>Whitney v. Citibank, N.A.</u>, 782 F.2d 1106, 1118 (2d Cir. 1986) ("When a difficulty faced in calculating damages is attributable to the defendant's misconduct, some uncertainty may be tolerated."); <u>accord</u> <u>N.Y.C. Transit Auth. v. Express Scripts, Inc.</u>, No. 19 Civ. 5196 (JMF), 2022 WL 3577426, at *3 (S.D.N.Y. Aug. 19, 2022).

The Court finds that any uncertainty about whether Delshah will receive Percentage Rent under the Chelsea Leases is not attributable to Free People's breach of the Lease. Delshah bears the burden to prove a causal connection between Free People's breach of the Lease and the non-receipt of Percentage Rent under the Chelsea Leases. <u>State v. UPS</u>, 253 F. Supp. 3d 583, 687 (S.D.N.Y. 2017). But Delshah's non-receipt of Percentage Rent under the Chelsea Leases results from a combination of at least the following circumstances, none of which were caused by any act of Free People, let alone a wrongful act: (i) Delshah's decision to select Chelsea Winery and Markets as tenants for the Leased Space; (ii) the nearly year-long negotiation of the Chelsea Leases; (iii) the manner in which Chelsea Winery and Markets manage their business in the Leased Space; (iv) the continued financial impact of the pandemic on the financial results of Chelsea Winery and Markets; (v) the impact of construction awnings installed by an adjacent property owner; and (vi) Delshah's decision to amend the commencement date of the Chelsea Leases to November 1, 2022, which granted Chelsea Winery and Chelsea Markets six, rather than

three, months of free rent.  (See ECF Nos. 136 ¶¶ 6–8; 138 ¶¶ 7–8; 140-3; 140-4; 142 at 13; 143-3; 144-1 at 15; 147-1 at 135–36; 175-1 at 14; 178 at 64).  In other words, Free People has not "made difficult" recovery of Percentage Rent under the Chelsea Leases, and therefore, should not bear the burden of Delshah's uncertain future ability to receive those amounts.  Cf. In re Gen'l Motors LLC Ignition Switch Litig., No. 14 Md. 2543 (JMF), 2016 WL 3920353, at *17 (S.D.N.Y. July 15, 2016) (finding wrongdoer-uncertainty principle inapplicable).

Accordingly, in performing the calculation of Section 22(d)(iii) damages, the Court will include the Percentage Rent that Delshah is projected to receive under the Chelsea Leases. (See § IV.A.2.c, infra).

### 2.  Calculation of Section 22(d) Damages

As noted above, the parties submitted expert reports setting forth competing calculations of damages under Section 22(d) of the Lease—calculations that were subsequently updated at the Court's request before the Hearing.  (ECF Nos. 155; 163).  Delshah conceded that Ms. Locatell had made several errors (ECF Nos. 159 ¶ 3 (listing corrections and "inadvertent omissions"); 178 at 37), and Free People pointed out several more, such that Ms. Locatell's calculations have, at most, minimal utility in the exercise of calculating Delshah's damages.  (ECF Nos. 146 at 4; 178 at 44, 46, 52–54, 56).  Cf. Redcell Corp. v. A.J. Trucco, Inc., No. 20 Civ. 0018 (AT) (SLC), 2022 WL 3700148, at *9 (S.D.N.Y. Aug. 26, 2022) (explaining that experts' mathematical mistakes undermined weight of their opinions).  After the Hearing, the parties again revised their damages calculations.  (ECF Nos. 177; 177-1; 177-2).  Suffice it to say, the parties' repeated revisions of their calculations have only exacerbated the challenge of executing an already-complicated calculation of damages under Section 22(d) of the Lease.  Applying the threshold conclusions

above to the contractual language in Section 22(d), the Court arrives at the calculations set forth below.

### a. Section 22(d)(i) Damages

As noted above, Section 22(d)(i) permits Delshah to recover "[t]he worth at the time of award of any unpaid rent which has been earned at the time of such termination[.]" (ECF No. 75-1 at 35 § 22(d)(i)).  The Lease also provides that, due to its default, Free People is required to pay a late fee of two percent.  (ECF No. 75-1 § 40).  Free People concedes that Delshah is also entitled to nine percent statutory interest as of the award date under New York law.  See N.Y.C.P.L.R. § 5004.  (See ECF Nos. 142 at 9; 162-1 at 3; 175-1 at 5; 177-1 at 1).

The parties agree that the starting date for the Section 22(d)(i) calculation is March 1, 2020, the date on which Free People became in arrears on its rent.  See Delshah I, 2022 WL 4228213, at *8 (citing ECF Nos. 75-35 at 1, 11; 81 at 15 ¶ 45; 88 at 14 ¶ 66).  The Court has determined that the Termination Date of the Lease occurred on June 10, 2020. (See § IV.A.1.a, supra).  Accordingly, the Court calculates Delshah's Section 22(d)(i) damages as follows:

| Category | Amount |
|---|---|
| Rent due 3/1/2020 – 6/1/2020 | $324,142.81[11] |
| Statutory Interest (9%) | $5,477.10[12] |
| Late Fee (2%) | $6,482.86[13] |
| **TOTAL SECTION 22(d)(i) DAMAGES** | **$336,102.77**[14] |

### b.  Section 22(d)(ii) Damages

Section 22(d)(ii) entitles Delshah to recover "[t]he worth at the time of the award of the amount by which the unpaid rent which would have been earned after termination until the time of award exceeds the amount of such rental loss that [Free People] proves could have been reasonably avoided[.]"  (ECF No. 75-1 at 35 § 22(d)(ii)).  Thus, Delshah is entitled to recover (i) the base rent and additional charges that Free People would have paid over the balance of the Lease Term; (ii) less the avoidable rental loss, i.e., the amount that would have been paid under the Chelsea Leases; (iii) plus statutory interest and the late fee.  (ECF Nos. 135 at 17; 142 at 18; 159-1 at 7–10; 162-1 at 11).

The parties' disputes involve the second component of the Section 22(d)(ii) calculation, the avoidable rental loss.  First, as discussed above, Free People has not shown that Delshah's

---

[11] See ECF Nos. 162-1 at 3–4; 175-1 at 5; 177-1 at 1.

[12] The Court's calculation of statutory interest differs from Mr. Tener's.  (ECF No. 162-1 at 4).  As noted above, Free People provided the Court with Excel files for each of the tables in Mr. Tener's Second Report.  (See n.6, supra).  Based on the Court's review of the Excel file for Table 1 of Mr. Tener's Second Report, there appears to have been two formula errors in the calculation of statutory interest.  While Mr. Tener provides the correct calculation of statutory interest for March 1, 2020 ($64.72) and April 1, 2020 ($1,021.34), his calculations for May 1, 2020 ($1,483.44) and June 1, 2020 ($1,502.09) are incorrect. (ECF No. 162-1 at 4).  The correct calculation for May 1, 2020 – 9/100/12*$261,329.27 – results in the statutory interest amount of $1,959.97, and the correct calculation for June 1, 2020 – (9/100)/12*$324,142.81 – results in the statutory interest amount of $2,431.07.  The sum of $64.72, $1,021.34, $1,959.97, and $2,431.07, is $5,477.10.

[13] This figure represents the outstanding amount of rent, $324,142.81, multiplied by 2%.  (See ECF Nos. 162-1 at 4; 175-1 at 5; 177-1 at 1).

[14] The sum of $324,142.81, $5,477.10, and $6,482.86.

efforts to re-market the Leased Space were commercially unreasonable, i.e., the Court has rejected Free People's argument that Delshah could have avoided at least an additional $1,150,000.00 under the Chelsea Leases if it had rented the Leased Space earlier.  (See § IV.A.1.b, supra; ECF No. 162-1 at 8 n.9 ("Had [Delshah] made [commercially reasonable] efforts and secured a tenant at the rental rates set forth in the [Chelsea Leases], [Delshah] would have avoided an additional $1,150,000.00 in base rent alone between November 1, 2022 and October 31, 2023.")).  Because the Court rejects Free People's argument that Delshah could have rented the Leased Premises earlier, the starting point for calculating the rent payable under the Chelsea Leases is the rent commencement date under those leases, November 1, 2022. (ECF Nos. 137-1 at 13; 140-3 at 2 ¶ 1; 140-4 at 2 ¶ 1; 149 at 1 ¶ 2).

Second, as discussed above, the Court has concluded that Free People is entitled to credit for Percentage Rent expected under the Chelsea Leases, i.e., Percentage Rent should be included in the total avoidable rental loss offset against Free People's unpaid Base Rent and other charges for the balance of the Lease Term.  (See § IV.A.1.c, supra).  Thus, Ms. Locatell's calculations of Delshah's Section 22(d)(ii) damages—which ignored Percentage Rent and also incorrectly calculated the amount of free rent under the Chelsea Leases—are inapposite.  (ECF No. 159-1 at 7–10; see ECF No. 149 at 1 ¶ 2 (Ms. Locatell admitting error in calculation of rent under Chelsea Leases)).

Third, the Court rejects Delshah's argument that the default of Chelsea Winery and Chelsea Markets under the Chelsea Leases increases the amount of Section 22(d)(ii) damages.  As noted above (see n.4, supra), Delshah, citing, inter alia, media articles, argues that Chelsea Winery and Chelsea Markets fell into arrears on rent due and failed to cure under the Chelsea

Leases, in response to which Delshah terminated the Chelsea Leases and filed holdover petitions against both entities in New York State Court.  (ECF Nos. 180; 180-1; 180-2).  Delshah asks the Court to exclude $451,499.98 from the amounts due under the Chelsea Leases as of November 30, 2023, and argues that the Section 22(d)(ii) damages now due from Free People increases by that amount, plus $98,708.33 each month through the date of judgment. (ECF No. 180 at 2).  In response, Free People points out that, apart from the speculation behind Delshah's calculation of these amounts, the language of Section 22(d)(ii) is not "actual rent" paid, but rather rent that it proves "could have been reasonably avoided[,]" such that the Court's inquiry "does not require an actual tenant, let alone an actual tenant who is or is not paying rent[.]"  (ECF No. 182 at 1–3).  Free People urges the Court to compare the opinions of Mr. Tener and Ms. Locatell—both of which factored in rent due under the Chelsea Leases—to determine the amount of rental loss that Delshah could have reasonably avoided, rather than perform "an exact accounting of the amounts Delshah has and will actually receive from a new tenant[.]"  (Id. at 2).

The Court agrees with Free People that the extent to which Chelsea Winery and Chelsea Markets have failed or will fail to pay rent under the Chelsea Leases does not change the calculation of damages under Section 22(d)(ii), which does not consider actual rent received, but instead the amount that Free People proves Delshah "could have [] reasonably avoided." (ECF No. 75-1 at 35 § 22(d)(2)).  Consistent with the conclusion above regarding Percentage Rent (see § IV.A.1.c, supra), the Court finds that any gap between the amount of rent Delshah actually receives under the Chelsea Leases and the amount Delshah could have received is not attributable to Free People's breach of the Lease.  Rather, that results from the same

combination of circumstances, including especially Delshah's selection of Chelsea Winery and Chelsea Markets at tenants and the manner in which they ran their business in the Leased Space. The Court is bound by the unambiguous language of the Lease, which makes clear that what matters under Section 22(d)(ii) is the amount of rent that Free People shows Delshah <u>could</u> have received for the Leased Space, not what it <u>actually</u> received.  <u>See</u> <u>Delshah I</u>, 2022 WL 4228213, at *13 ("Under New York law, 'a court must give full effect to unambiguous contract terms.'") (quoting <u>HOP Energy, L.L.C. v. Loc. 553 Pension Fund</u>, 678 F.3d 158, 162 (2d Cir. 2012)). Therefore, the Court declines Delshah's request to exclude from avoidable rental loss the amount of rent that has not been and will not be paid under the Chelsea Leases.[15]

Accordingly, the Court calculates Section 22(d)(ii) damages as follows:

---

[15] Because the Court rejects Delshah's arguments as a matter of contractual interpretation, it need not reach Free People's additional evidentiary counterarguments.  (ECF No. 182 at 3 & nn.4–5).

| Category | Amount |
|---|---|
| Free People Lease (ECF No. 75-1) | |
| • Base Rent | $5,092,077.40[16] |
| • Additional Charges | $255,483.14[17] |
| • Less Payments by Free People | $371,593.11[18] |
| • Sub-Total (Unpaid by Free People) | $4,975,967.43[19] |
| Chelsea Leases (ECF Nos. 140-1; 140-2)[20] | |
| • Base Rent | $1,158,625.00[21] |
| • Elevator | $2,142.61[22] |
| • Insurance | $139.70[23] |
| • Water | $1,803.08[24] |
| • Tax Recovery | $10,859.91[25] |
| • Percentage Rent | $200,404.15[26] |
| • Sub-Total (Avoidable Rental Loss) | $1,373,974.45[27] |
| Amount unpaid by Free People less Avoidable Rental Loss | $3,601,992.98 |
| Statutory Interest (9%) | $636,921.50[28] |
| Late Fee (2%) | $72.039.86[29] |
| **TOTAL SECTION 22(d)(ii) DAMAGES** | **$4,310,954.34** |

---

[16] ECF Nos. 162-1 at 11 Table VII; 177-1 at 1.

[17] Id.

[18] Id.

[19] Id.

[20] The Court uses the breakdown of base rent and additional charges that Mr. Tener has provided.  (See ECF No. 159-1 at 8.)

[21] ECF No. 162-1 at 11 Table VII.

[22] Id.

[23] Id.

[24] Id.

[25] Id.

[26] Id. at 10–11 & Table VII.

[27] Id. at 11 Table VII.

[28] As with Section 22(d)(i) damages, Free People admits that Delshah is entitled to statutory interest on Section 22(d)(ii) damages as of the award date at 9%.  (See ECF Nos. 75-1 at 43 ¶ 40; 142 at 9; 162-1 at 3; 175-1 at 5; 177-1 at 1.)  The Court employs Mr. Tener's calculation of statutory interest as of October 31, 2023 (ECF No. 162-1 at 11 Table VII), but notes that Free People has not provided the formula for this calculation, which, in any event, will need to be updated as of the date of Judge Furman's decision.  (See ECF No. 162-1 at 8.)

[29] $3,601,992.98 * .02.

#### c. __Section 22(d)(iii) Damages__

Section 22(d)(iii) entitles Delshah to recover "[t]he worth at the time of award of the amount by which the unpaid rent for the balance of the Lease Term after the time of award exceeds the amount of such rental loss that [Free People] proves could have been reasonably avoided[.]" (ECF No. 75-1 at 36 § 22(d)(iii)). This calculation is therefore forward-looking, comparing what Delshah would have received had Free People not breached the Lease with what it reasonably could expect to receive from another tenant of the Leased Space. Aside from Percentage Rent—which shall be included for the same reasons discussed with respect to Section 22(d)(ii) damages, <u>supra</u>—the parties largely agree on the remaining categories to be included in Section 22(d)(iii) damages as well as the applicable discount rate, with some minor discrepancies in amount. (<u>See</u> ECF No. 177-1 at 2). Accordingly, the Court calculates Section 22(d)(iii) damages as follows:

| Category | Amount |
|---|---|
| Free People Lease (ECF No. 75-1) | |
| Rent Due from Free People 11/1/2023 – 1/31/2027 | $5,897,316.05[30] |
| Chelsea Leases (ECF Nos. 140-1; 140-2) | |
| • Base Rent 11/1/2023-1/31/2027 | $4,012,214.50[31] |
| • Percentage Rent | $1,058.997.61[32] |
| • Real Estate Tax Reimbursement | $196,614.05[33] |
| • Elevator, Water & Insurance | $12,821.02[34] |
| • Sub-Total (Avoidable Rental Loss) | $5,280,647.18[35] |
| Difference | $616,668.87[36] |
| Discounted at 6.5%[37] | $545,199.99 |
| **TOTAL SECTION 22(d)(iii) DAMAGES** | **$545,199.99** |

### d.  Section 22(d)(iv) Damages

Section 22(d)(iv) entitles Delshah to recover:

[a]ny other amount reasonably necessary to compensate [Delshah] for all the detriment proximately caused by [Free People's] failure to perform its obligations under this Lease or which in the ordinary course of things would be likely to result therefrom, specifically including reasonable broker's fees and advertising expenses incurred by [Delshah] in connection with reletting the whole or any portion of the Leased Space, the reasonable costs incurred in removing and/or storing [Free People's] or other Leased Space user's property, the cost of repairing, altering, remodeling, or otherwise putting the Leased Space into condition acceptable to a new tenant or tenants, whether for the same or a different use, economic incentives accepted by replacement tenants, and all other reasonable expenses incurred by [Delshah] in enforcing [its] remedies.

---

[30] Delshah calculates the rent due from Free People from November 1, 2023 to January 31, 2027 under the Lease as $5,838,227.62, which is different from the amount calculated by Ms. Locatell, $5,980,244.00. (Compare ECF No. 177-1 at 2 with ECF No. 159-1 at 11).  The Court employs Free People's calculation, for which Mr. Tener has provided a breakdown, of $5,897,316.05.  (ECF Nos. 162-1 at 12 Table VIII; 177-1 at 2).

[31] ECF No. 162-1 at 12 Table IX.

[32] Id.

[33] Id.

[34] Id.

[35] $4,012,214.50 + $1,058,997.61 + $196,614.05 + $12,821.02.

[36] $5,897,316.05 - $5,280,647.18; see ECF No. 177-1 at 2.

[37] The parties agree that the applicable discount rate under Section 40 of the Lease is the Federal Reserve Bank of New York rate of 5.5% plus 1%, or 6.5%.  (See ECF Nos. 75-1 at 43 § 40; 142 at 9; 177-1 at 2). Neither Mr. Tener nor Ms. Locatell explains how they applied the 6.5% discount; however, it appears from the parties' figures that they did so in a substantially similar manner.  (See ECF No. 177-1 at 2).

(ECF No. 75-1 at 36 § 22(d)(iv)).  The parties agree that the three components of this calculation are:  (i) tenant installation costs of $270,000.00;[38] (ii) leasing commissions of $420,000.00;[39] and (iii) Delshah's legal fees associated with re-leasing of $73,887.00, although they differ in whether proration of these amounts is warranted.  (ECF Nos. 177-1 at 3; 178 at 7, 35).[40]

Delshah argues that proration is not warranted because the Lease does not contemplate proration of any of the Section 22(d)(iv) expenses and because it incurred these expenses in the first year of the Chelsea Leases.  (ECF Nos. 135 at 20; 146 at 10; see ECF No. 139-1 at 1 ¶ 4).  In support of its position, Delshah cites the "well-settled rule that 'when the parties by their contract provide for the consequences of a breach, lay down a rule to admeasure the damages[,] and agree when they are to be paid, the remedy thus provided must be exclusively followed[.]'" U.S. Fid. & Guar. Co. v. Braspetro Oil Servs. Co., 369 F.3d 34, 71 (2d Cir. 2004) (quoting X.L.O. Concrete Corp. v. John T. Brady & Co., 104 A.D.2d 181, 184 (1st Dep't 1984)).  Thus, Delshah contends that Free People must pay the full amount of both tenant installation costs and the leasing commission.

Free People contends that proration is warranted because the Chelsea Leases are seven and one-half years longer than the Lease and therefore "[i]t is not reasonable for Free People to pay all of the costs commensurate with Delshah having obtained a significantly longer lease

---

[38] Delshah asserted that the tenant installation costs were $287,500.00, using the maximum contributions contemplated under the Chelsea Leases (ECF Nos. 140-1 at 8 ($215,625.00); 140-2 at 8 ($71,875.00)), but Delshah has admitted that in fact it only reserved $270,000.00.  (ECF No. 143-3 at 3).  Accordingly, the Court uses the lower of the two figures, $270,000.00.

[39] ECF No. 139-1 at 1 ¶ 4.

[40] Free People also concedes that the free rent afforded under the Chelsea Leases was "reasonably necessary" under Section 22(d)(iv), but this amount was accounted for under Section 22(d)(ii) damages, (ECF Nos. 142 at 26–27; 162-1 at 13), and Delshah does not disagree.  (See ECF No. 135 at 19).

term."  (ECF No. 142 at 27).  In support of its position that an award of the full amounts of the tenant installation costs and leasing commission is not "reasonably necessary to compensate" Delshah, Free People cites a 2000 Missouri intermediate appellate court decision that prorated the amount of a broker's re-leasing commission to the period remaining on the breached lease. (ECF No. 142 at 28 (citing JCBC v. Rollstock, Inc., 22 S.W.3d 197, 201–02 (Mo. Ct. App. 2000))). Applying the same proration approach, Mr. Tener calculates that the income from the first five and one-half years of the Chelsea Leases "would anticipate a leasing commission of $239,155[,]" to which he then applies a 9.13% discount[41] to arrive at an "applicable leasing commission of $217,326[,]" or just over half of the commission that Delshah actually paid.  (ECF No. 162-1 at 13). Mr. Tener similarly prorates the tenant installment costs over five and one-half years to arrive at a figure of $123,750.00.  (Id.)

Free People has not provided the Court with persuasive authority to disregard the plain language of Section 22(d)(iv), which entitles Delshah to recover the amounts it has paid due to Free People's breach of the Lease.  (ECF No. 75-1 at 36 § 22(d)(iv)).  Free People does not, in fact, dispute that Delshah has paid the full $420,000.00 leasing commission and set aside $270,000.00 for improvements under the Chelsea Leases.  Delshah has therefore suffered to the "detriment" of these two amounts (id.), and is entitled to recover them in full from Free People.

Accordingly, the Court calculates Section 22(d)(iv) damages as follows:

| Category | Amount |
|---|---|
| Tenant Installation Costs | $270,000.00 |
| Leasing Commission | $420,000.00 |
| Legal Fees | $73,887.00 |
| **TOTAL SECTION 22(d)(iv) DAMAGES** | **$763,887.00** |

---

[41] Mr. Tener asserts that the "negotiated commission" under the Lantern Agreement represents a 9.13% discount off a "traditional [commission] schedule."  (ECF No. 162-1 at 13).

*      *      *

In sum, the Court respectfully recommends that Delshah be awarded the following damages, with prejudgment interest calculations to be updated as of the date of the Court's decision regarding this Report and Recommendation:

| Category | Amount |
|---|---|
| Section 22(d)(i) | $336,102.77 |
| Section 22(d)(ii) | $4,310,954.34 |
| Section 22(d)(iii) | $545,199.99 |
| Section 22(d)(iv) | $763,887.00 |
| **TOTAL** | **$5,956,144.10** |

### e.  Postjudgment Interest

Although Delshah has not specifically requested postjudgment interest (see generally ECF No. 24), such an award is mandatory in this action.  The applicable federal statute provides that "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court . . . calculated from the date of entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment."  28 U.S.C. § 1961(a). The Second Circuit has explained that an award of postjudgment interest is mandatory.  See Schipani v. McLeod, 541 F.3d 158, 165 (2d Cir. 2008); see also Suriel v. Cruz, No. 20 Civ. 8442 (VSB) (SLC), 2022 WL 1750232, at *17 (awarding mandatory postjudgment interest), adopted by, 2022 WL 1751163 (S.D.N.Y. May 31, 2022).  Given the mandatory nature of postjudgment interest, the Court respectfully recommends that Delshah be awarded postjudgment interest in an amount consistent with 28 U.S.C. § 1961.

## V.  **CONCLUSION**

For the reasons set forth above, the Court respectfully recommends that:  (1) Delshah be awarded damages in the amount of $5,956,144.10, with prejudgment interest calculations to be updated as of the date of Judge Furman's decision and with postjudgment interest under 28 U.S.C. § 1961, and (2) the question of attorneys' fees and costs continue to be deferred until after that decision.

Dated:    New York, New York
          March 13, 2024

_____
**SARAH L. CAVE**
**United States Magistrate Judge**

\*                         \*                         \*

**NOTICE OF PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION**

The parties shall have fourteen (14) days (including weekends and holidays) from service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure.  See also Fed. R. Civ. P. 6(a), (d) (adding three additional days when service is made under Fed. R. Civ. P. 5(b)(2)(C), (D) or (F)).   A party may respond to another party's objections within fourteen (14) days after being served with a copy.  Fed. R. Civ. P. 72(b)(2).  Such objections, and any response to objections, shall be filed with the Clerk of the Court.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), (d), 72(b).  Any requests for an extension of time for filing objections must be addressed to Judge Furman.

**FAILURE TO OBJECT WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.**  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), (d), 72(b); Thomas v. Arn, 474 U.S. 140 (1985).