UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
:
DELSHAH 60 NINTH, LLC,                                            :
                                                                  :
                         Plaintiff,                               :        20-CV-5905 (JMF)
                                                                  :
         -v-                                                      :
                                                                  :        OPINION AND ORDER
FREE PEOPLE OF PA, LLC,                                           :        ADOPTING REPORT AND
                                                                  :        RECOMMENDATION
                         Defendant.                               :
                                                                  :
------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

       This case, familiarity with which is presumed, is one of many disputes that arose between landlords and commercial tenants concerning unpaid rent from the first few months of the COVID-19 pandemic.  Plaintiff Delshah 60 Ninth, LLC ("Delshah") and Defendant Free People of PA, LLC ("Free People") each moved for summary judgment, *see* ECF Nos. 67, 72, and, on August 17, 2022, the Court adopted Magistrate Judge Sarah L. Cave's Report and Recommendation in substantial part granting Delshah's motion for summary judgment.  *See* ECF No. 119.  In that same Order, the Court re-referred the matter to Magistrate Judge Cave for an inquest on damages, including attorneys' fees and costs.  *See id.*  On March 13, 2024, Judge Cave issued a Report and Recommendation ("R&R") recommending (1) that Delshah be awarded $5,956,144.10 in damages along with prejudgment and post-judgment interest and (2) that the question of attorneys' fees and costs be deferred.  *See* ECF No. 183.  Delshah and Free People both filed timely objections to the R&R, *see* ECF Nos. 187 ("Def.'s Obj."), 189

("Pl.'s Obj."), and thereafter both filed responses to the other's objections, *see* ECF Nos. 193 ("Pl.'s Response"), 194 ("Def.'s Response").[1]

In reviewing a Report and Recommendation, a district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). A district court "must determine *de novo* any part of the magistrate judge's disposition that has been properly objected to." Fed. R. Civ. P. 72(b)(3); *see also United States v. Male Juvenile (95-CR-1074)*, 121 F.3d 34, 38 (2d Cir. 1997). To accept those portions of the report to which no timely objection has been made, however, a district court need only satisfy itself that there is no clear error on the face of the record. *See, e.g.*, *Wilds v. United Parcel Serv., Inc.*, 262 F. Supp. 2d 163, 169 (S.D.N.Y. 2003). This clear error standard also applies when a party makes only conclusory or general objections, or simply reiterates its original arguments. *See, e.g.*, *Ortiz v. Barkley*, 558 F. Supp. 2d 444, 451 (S.D.N.Y. 2008).

Free People's objections largely reiterate its original arguments concerning damages, and Delshah's objections either do the same or raise new arguments that could have and should have been raised before Magistrate Judge Cave in the first instance and thus need not be considered at all. *See Piligian v. Icahn Sch. of Med. at Mount Sinai*, 490 F. Supp. 3d 707, 716 (S.D.N.Y. 2020) ("[N]ew arguments and factual assertions cannot properly be raised for the first time in objections to the report and recommendation, and indeed may not be deemed objections at all."). Accordingly, the Court concludes that the clear error standard of review applies here. For the reasons that follow, the Court concludes that there is no clear error on the face of the record and,

---

[1] On September 3, 2024, Free People filed a letter seeking to "alert the Court to recent factual developments that impact the calculation of [Delshah's] damages." ECF No. 196. Delshah filed a letter response a week later. ECF No. 198. The Court will address the substance of these letters along with Free People's original set of objections.

even reviewing Magistrate Judge Cave's R&R *de novo* — which the Court has done — both parties' objections fall short. Thus, the Court adopts the R&R in full.

The Court will address each set of objections in turn.

## FREE PEOPLE'S OBJECTIONS

Free People disputes the damages and damages offset calculations set forth in the R&R pursuant to two sections of the Free People Lease Agreement: Sections 22(d)(ii) and 22(d)(iv). *See* ECF No. 67-18 ("Free People Lease"). Neither provision supports its arguments.

Section 22(d)(ii) provides that Delshah is entitled to recover "[t]he worth at the time of award of the amount by which the unpaid rent which would have been earned after termination until the time of award exceeds the amount of such rental loss that [Free People] proves could have been reasonably avoided." Free People Lease § 22(d)(ii). In evaluating "the amount of . . . rental loss that . . . could have been reasonably avoided," the Court looks to Section 22(e) of the Lease, which provides that, "[i]n the event of any termination of this Lease or repossession of the [space,] . . . Landlord agrees to use *commercially reasonable efforts* to relet the Leased Space in order to mitigate the damages that will otherwise be incurred because of such early termination or repossession." *Id*. § 22(e) (emphasis added). Where, as here, a "commercially reasonable efforts" clause is not defined in a contract, courts generally hold that "[t]he standard for satisfying commercial reasonability under New York law is a fairly lenient one." *Shane Campbell Gallery, Inc. v. Frieze Events, Inc*., 441 F. Supp. 3d 1, 4 (S.D.N.Y. 2020); *see* R&R 21. Free People previously took the position that Delshah's efforts fell short of this standard. Now, however, its objection to the R&R on this score is limited to arguing that, even if Delshah did meet its obligation of exercising commercially reasonable efforts, the Court must nonetheless "make a determination as to when those efforts should have resulted in a new lease for the

3

Leased Space, and deduct the rent that would have been received under that Lease from the amounts owed under the Free People Lease." Def.'s Obj. 11. Specifically, Free People argues that Magistrate Judge Cave erred by disregarding both parties' experts' opinions that Delshah should have started receiving replacement rent prior to May 2022 and relying instead on the leases to Chelsea Winery and Chelsea Bar and Lounge (together, the "Chelsea Leases"), which commenced on November 1, 2022. *See* ECF No. 140-1 ("Chelsea Winery Lease"); ECF No. 140-2 ("Chelsea Bar and Lounge Lease"). The Court disagrees.

For starters, Delshah's expert, Sharon Locatell, did *not* agree that the space could have been re-leased by August 2021. To the contrary, she clearly disagreed with the opinion of Free People's expert, Thomas J. Tener, as an "egregiously overly optimistic assumption that has no basis in fact or reality." ECF No. 148-1, ("Locatell Report"), at 12. For similar reasons, Magistrate Judge Cave reasonably rejected Tener's opinion that the "Leased Space had a 'very high probability of being leased by August 2021.'" R&R 22-23; *see* ECF No. 162-1 ("Tener Report"). As she thoroughly articulated in the R&R, Delshah began working to find a suitable tenant for the space as soon as one week after Free People vacated the premises in August 2020. Delshah almost immediately began working with its broker on advertising; began actively marketing the space and directly reaching out to potential tenants; and, by mid-March 2021, received an offer from Chelsea Winery. *See* ECF No. 143-2 at 6, 11, 13, 16. Notably, Delshah received no other offers. *See* ECF No. 143-1, at 10. Commercial lease agreements, especially for lease terms lasting over ten years, are no small endeavor, and Delshah actively pursued the lease, engaging in negotiations with Chelsea Winery for almost a year before finally entering into the Chelsea Leases in May 2022. *See* ECF No. 147-1, at 136; ECF No. 143-2, at 6. In view of this record, it is reasonable to conclude — as Magistrate Judge Cave did — that the starting

4

point for calculating the offset for avoidable rental loss under Section 22(d)(ii) of the Free People Lease should be the actual rent commencement date under the Chelsea Leases.  *See* R&R 30.

In the alternative, Free People argues that the R&R should have determined that August 1, 2022, was the latest starting point for avoidable rental loss because Delshah provided three more free months even though it had no obligation to do so and did so only after this Court had ruled in its favor on liability — that is, only after it knew that any difference in the rent owed by the new tenants and the rent owed under the Lease would likely be charged to Free People.  *See* Def.'s Obj. 13-16.  But this argument can be swiftly rejected, substantially for the reasons stated in Delshah's response.  That is, the record supports the conclusion that the additional three-month extension was reasonably necessary to allow Chelsea Winery and Chelsea Bar and Lounge to obtain liquor licenses and Delshah to issue the Chelsea entities a subordination, non-disturbance and attornment agreement ("SNDA"), both required under various provisions of the Chelsea Leases.  *See, e.g.*, Chelsea Winery Lease 7, 19, 48; Chelsea Bar and Lounge Lease 7, 19, 48.  Notably, Free People itself conceded that at least some free rent was commercially reasonable.  *See* R&R 36 n.40.  The extension granted to the Chelsea entities was thus commercially reasonable, *see Holland Loader Co., LLC v. FLSmidth A/S*, 313 F. Supp. 3d 447, 469 (S.D.N.Y. 2018), and does not support Free People's attempt to offset damages using August 1, 2022, as the anchor point.

Next, Free People objects to the R&R's damages calculation pursuant to Section 22(d)(iv) of the Free People Lease, which entitles Delshah to recover "[a]ny other amount reasonably necessary to compensate [Delshah] *for all the detriment* proximately caused by [Free People's] failure to perform its obligations under this Lease or which in the ordinary course of things would be likely to result therefrom."  Free People Lease § 22(d)(iv) (emphasis added).

5

The parties agreed on three categories of costs associated with re-leasing the property to the Chelsea entities, including tenant installation costs, leasing commissions, and Delshah's legal fees associated with re-leasing.² Free People argues that the first two categories should be prorated to reflect the differences between the terms of the Free People Lease and the Chelsea Leases, the latter of which exceed the former by seven-and-a-half years, on the ground that the Free People Lease "expressly limits Delshah's damages to those amounts 'reasonably necessary' to compensate Delshah." *See* Def.'s Obj. 16-18. But the very lease provision on which Free People relies explicitly allows for damages "which in the ordinary course of things would be likely to result" from the breach. Free People Lease § 22(d)(iv). A new lease agreement with different terms is "likely" to occur in an effort to mitigate losses.

In fact, an earlier subsection in the Free People Lease explicitly acknowledges that Delshah may "relet . . . for such term(s) (which may be greater or less than the period that otherwise would have constituted the balance of the Initial Lease Term[)]." *Id.* § 22(b). It thus makes plain that the parties were aware that Delshah might have to relet for a longer term in order to mitigate damages. Yet the parties did not contract to limit the "likely" damages provided for in Section 22(d)(iv) to an amount that is proportional to the original lease term. *See Populus Media, Inc. v. Erb*, No. 1:23-CV-4160 (MKV), 2024 WL 1313493, at *4 (S.D.N.Y. Mar. 26, 2024) ("[T]he New York Court of Appeals has recognized that 'when the parties by their contract provide for the consequences of a breach, lay down a rule to admeasure the damages and agree when they are to be paid, the remedy thus provided must be exclusively

---

²       Plaintiff does not object to Magistrate Judge Cave's conclusion that attorney's fees were properly determined, *see* R&R 37, and, thus, has waived any such objection. In any event, the waiver notwithstanding, the Court has reviewed that portion of the R&R, unguided by objections, and finds it to be well reasoned and grounded in fact and law.

6

followed.'" (quoting *McCready v. Lindenborn*, 65 N.E. 208, 211 (N.Y. 1902)) (emphasis omitted)).  The cases on which Free People relies are both non-binding and inapposite.  In *JCBC, L.L.C. v. Rollstock, Inc.*, 22 S.W.3d 197, 198 (Mo. Ct. App. 2000), the landlord in question voluntarily relet the property without any contract language to guide a damages analysis.  And in *One Whitehall Co. v. Wang Lab'ys, Inc.*, No. 87-CV-2118 (JEL), 1990 WL 3945, at *3 (S.D.N.Y. Jan. 18, 1990), the lease expressly included language limiting damages as a result of reletting to only a period that overlapped with the period of the original lease.  Because of Free People's breach, Delshah faced "the detriment" of $420,000 in leasing commissions and set aside $270,000 for improvements under the Chelsea Leases.  Def.'s Obj. 16.  Given that the Free People Lease did not expressly provide for prorating, Delshah is entitled to recover these amounts in full.

Finally, in its September 3, 2024 letter, Free People disputes the $420,000 in real estate broker's commissions that the R&R recommended awarding to Delshah, arguing that it recently learned — through filings in a separate state court action — that Delshah "has *not* in fact 'paid the full $420,000 leasing commission.'"  *See* ECF No. 196, at 2.  Specifically, in the state court action, a commercial real estate broker alleged that Delshah still owed $146,666.67 in commissions, and in Delshah's answer, it "admits that it did not pay the balance of $146,666.67, and asserts a number of defenses and counterclaims based on Chelsea Wine's alleged unsuitability as tenants."  *See id.* at 2; *see also* ECF No. 196-1.  That does not call for altering the damages recommended in the R&R, however, because — as Delshah argues in its response — Delshah is entitled to "reasonable expenses *incurred* by [Delshah] in enforcing [its] remedies," *see* ECF No. 198, not expenses actually "paid," and the state court action does not give reason to doubt the conclusion that Delshah "incurred" liability for the full amount, *see id.* at 1-2.  That

7

conclusion is bolstered by the fact that, as Delshah concedes, it "remains obligated" for the full amount of the at-issue commissions "unless and until a court rules otherwise." *Id.* at 4.

For the foregoing reasons, Free People's objections to the R&R are overruled.

### DELSHAH'S OBJECTIONS

For its part, Delshah objects to the R&R's inclusion of percentage rent as part of the offset, arguing that the calculation of future projected percentage rents set forth by Tener (Free People's expert) and relied upon by Magistrate Judge Cave was erroneous. Pl.'s Obj. 1-3. As a threshold matter, the Court agrees with Free People that Delshah raises several arguments here that could and should have been raised before Magistrate Judge Cave, namely arguments concerning Tener's methodology and calculations set forth in his report (that Tener improperly considered the cumulative percentage rent thresholds from the Chelsea Leases when opining on percentage rent, made a "math error" when extrapolating estimated sales per square feet, and erred in using a three-percent growth rate in sales commencing in 2024). *See* Pl.'s Obj. 11-14, 16-17, 20-22; Def.'s Response 9-10. The Court deems these arguments to be forfeited and will not consider them. *See Piligian*, 490 F. Supp. 3d at 716.

The arguments that Delshah *did* raise before Magistrate Judge Cave are subject only to clear error review, *see Ortiz*, 558 F. Supp. 2d at 451, but they fall short under any conceivable standard of review. First, Delshah objects to Tener's qualifications to opine on percentage rent, *see* Pl.'s Obj. 10; *see also* ECF No. 146 ("Pl.'s Reply"), at 6 (arguing before Magistrate Judge Cave that Tener is not an expert on retail business operations), and to his use of historical Chelsea market sales figures to estimate future sales, *see* Pl.'s Obj. 17-19; *see also* Pl.'s Reply 6-7. As to the former objection, however, Delshah's own expert boasts strikingly similar qualifications to Tener: Both specialize in real estate and appraisals, which qualifies them to

8

opine on percentage rent. *Compare* ECF No. 162-1 ("Revised Tener Report"), at 18, *with* ECF No. 159-1 ("Revised Locatell Report"), at 17. As to the latter objection, Tener's use of historical Chelsea Market sales figures to estimate the costs Delshah could have reasonably avoided, *see* Revised Tener Report 9-10, is a reasonable way to estimate the future sales of the Chelsea entities. Indeed, courts often consider historical sales figures of similar, or indeed the same, businesses in projecting future sales. *See, e.g.*, *Travellers Int'l, A.G. v. Trans World Airlines, Inc.*, 41 F.3d 1570, 1579 (2d Cir. 1994) ("Established businesses have a record of past performance that may offer a reliable statistical basis for prediction."); *Learning Care Grp., Inc. v. Armetta*, No. 3:13-CV-1540 (VAB), 2016 WL 3248178, at *4 (D. Conn. June 12, 2016) (noting that future profits "may be calculated by extrapolating from past profits," and citing cases); *Rec. Club of Am., Inc. v. United Artists Recs., Inc.*, 696 F. Supp. 940 (S.D.N.Y. 1988) (accepting and awarding a calculation of lost future profits based on the past profits a mail order record club earned for entirely different records); *In re Ames Dep't Stores, Inc.*, 306 B.R. 43, 71 (Bankr. S.D.N.Y. 2004) (observing, in the bankruptcy context, that "the amount payable on other lease obligations — especially percentage rent, which typically is computed based on past sales — may be ascertainable only in retrospect, and may thus be billed by landlords in arrears").

That is what Tener did here. He used past sales from an established business — Chelsea Market — that moved one existing establishment, Chelsea Winery, across the street and created a "spinoff" establishment, Chelsea Bar and Lounge, also across the street. These Chelsea businesses are nothing like the "new" or completely relocated businesses at issue in the cases cited by Delshah. Pl.'s Obj. 17-19. Delshah's arguments that Chelsea Market is a well-known tourist destination that is too unique to use as an example and that the location of the new business is inferior fall short. Tener reasonably controlled for relevant differences, accounting

for the fact that the Chelsea Winery and Chelsea Bar and Lounge were not as well known as Chelsea Market itself and would need time to ramp up business. *See* Tener Report 9-10 (applying a grace period assuming that the new tenant's sale would remain flat through the end of 2023, applying a "conservative" inflationary growth rate of three percent per year thereafter, and reducing the projected sales figures from historical sales figures proportionally to square footage); *see also Travellers Int'l, A.G.*, 41 F.3d at 1579 ("Any calculation of damages based on lost profits always entails a degree of uncertainty caused by the need to rely on assumptions and estimates. The 'mere fact that a party disagrees with the methodology utilized or a particular assumption does not render proof speculative.'" (cleaned up) (quoting *Care Travel Co., Ltd. v. Pan Am. World Airways, Inc.*, 944 F.2d 983, 994-95 (2d Cir. 1991)). Moreover, the location of the new businesses is hardly "inferior": It is right across the street. *See* ECF No. 144-1 at 12-13, 35. It was therefore reasonable to rely on Tener's projections. And conspicuously, Delshah fails to offer a *more* appropriate method for measuring future profits. *See Rec. Club of Am.*, 696 F. Supp. at 944 ("Although it may be improper to rely on past sales as an indicator of future sales when a more accurate measure is available, there is no support for the contention that projections of past profits is improper as a matter of law."). Accordingly, the Court concludes that the R&R appropriately considered Tener's projections of percentage rents in calculating mitigation of damages.[3]

---

[3] Contrary to Deshah's suggestions, the R&R does not imply that Delshah is a wrongdoer or that Delshah would need to be considered a wrongdoer in order to include percentage rent in the damages offset. It merely concludes that Free People met its burden of showing that Delshah could have reasonably mitigated its damages by contracting for percentage rent in the Chelsea Leases, estimates of which should be part of the mitigation analysis, and that Delshah did not show otherwise. *See* R&R 25-26.

Finally, although Delshah's primary objection is to the adoption of Tener's calculations, it effectively also objects to inclusion of percentage rent as part of the setoff altogether because, it argues, Delshah did not in fact receive any percentage rent. Pl.'s Obj. 6-7, 10, 13, 19-20. The plain language of the Free People Lease, however, requires that the Court determine "such rental loss that [Free People] proves *could have been reasonably avoided*," not the actual costs avoided. Free People Lease §§ 22(d)(ii)-(iii) (emphasis added); R&R 32. Moreover, nothing in the Free People Lease limited the amount of damages that could be offset; to the contrary, the language is broad and allows for an offset of *all* costs that "could have been reasonably avoided." *Id.*; *see also Populus Media*, 2024 WL 1313493, at *4. The Free People Lease also provides that, "[i]n the event of any termination of this Lease or repossession . . . Tenant agrees to pay the Rent that would be payable under this Lease by Tenant in the absence of such termination or repossession, *less the net proceeds, if any, of any reletting*." Free People Lease § 22(c) (emphasis added). "Net proceeds" encompasses far more than just base rent, and no provision in the Lease limits damages offset to base rent alone. Indeed, percentage rents are common in retail lease agreements. *See, e.g.*, 74 N.Y. Jur. 2d Landlord and Tenant § 353 ("Leases by whose terms the rent is based, in whole or in part, on a percentage of the lessee's profits, sales, income, or receipts are in widespread use."). And courts commonly look to the new or replacement lease agreement to determine an offset to damages owed as a result of a breach of a landlord-tenant agreement. *See, e.g.*, *789 Ninth & 414 E. 74th Assocs. LLC v. Hundalani*, No. 21-CV-5314 (VM), 2023 WL 4472162, at *10 (S.D.N.Y. July 11, 2023); *2800 Hylan Blvd. v. Motiva Enters., LLC*, No. 09-CV-5065 (JFK), 2011 WL 11672773, at *7 (S.D.N.Y. Sept. 28, 2011); *One Whitehall Co. v. Wang Lab'ys, Inc.*, No. 87-CV-2118 (JEL), 1990 WL 3945, at *2 (S.D.N.Y. Jan. 18, 1990). Here, the Chelsea Leases expressly included a subsection establishing a

percentage rent payment structure, *see* Chelsea Winery Lease § 2; Chelsea Bar and Lounge Lease § 2, so Magistrate Judge Cave properly considered percentage rent payments as part of the "net proceeds . . . of any reletting," Free People Lease § 22(c), that Free People was entitled to subtract from the damages award.

For these reasons, Delshah's objections are also overruled.

## CONCLUSION

In sum, and for the reasons discussed above, Magistrate Judge Cave's Report and Recommendation dated March 13, 2024, is ADOPTED in its entirety. Delshah shall confer with Free People and, **no later than November 7, 2024**, file a proposed judgment consistent with this Opinion and Order, indicating whether it is agreed-upon or not.

The case is re-referred to Magistrate Judge Cave for a recommendation with respect to whether and to what extent to award attorney's fees and costs. *See, e.g.*, *Covanta Onondaga Ltd. v. Onondaga Cnty. Res. Recovery Agency*, 318 F.3d 392, 396 (2d Cir. 2003) ("[A] court that has concluded its adjudication of the merits of a case within its jurisdiction by entering a final judgment retains authority to take action with respect to some collateral matters related to the case, such as attorney's fees and costs, and sanctions." (citations omitted)).

SO ORDERED.

Dated: November 1, 2024
      New York, New York
                                        JESSE M. FURMAN
                                   United States District Judge